IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

VICKIE PHAN, individually and          )
Behalf of all others similarly situated, )
                                       )
         Plaintiff,                    )
                                       )        CIVIL ACTION NUMBER:
v.                                     )
                                       )        _____
PEAK DEBT CONSUMPTION, LLC )
CHRIS MCCORMICK,                       )
CREDIT PRECISION, INC.,                )
MARK MILLER,                           )
FISHER LAW GROUP, PLLC,                )        COMPLAINT – CLASS ACTION
DAVID FISHER, and                      )
HEGEMON GROUP                          )
INTERNATIONAL, LLC,                    )        JURY TRIAL DEMANDED
                                       )
         Defendants.                   )
_____)

## COMPLAINT IN CLASS ACTION FOR DAMAGES

COMES NOW, Plaintiff Vickie Phan, individually and on behalf of all others

similarly situated, and files this, her Complaint in Class Action for Damages

pursuant to the Credit Repair Organizations Act, ("CROA"), 15 U.S.C. § 1679, the

Georgia Debt Adjustment Act, OCGA § 18-5-1 *et seq*., and the Georgia Fair

Business Practices Act, OCGA § 10-1-390 *et seq*., against Peak Debt Consumption,

LLC, Chris McCormick, Credit Precision, Inc., Mark Miller, Fisher Law Group,

PLLC, David Fisher, and Hegemon Group International, LLC and shows this Honorable Court the following:

## **INTRODUCTION**

The Defendants are in the business of ripping off vulnerable people. Defendants took advantage of this Plaintiff who got behind on her bills and reached out for help from Defendants who fraudulently represented that Defendants could settle Plaintiff's debt for a fraction of what was owed, and then lined their pockets with Plaintiff's money rather than assisting her. What Defendants have done is criminal and reprehensible. Defendants should be forced to compensate Plaintiff and be punished so that they cease their illegal scheme.

1.

Defendants are a collection of interrelated entities, limited liability companies, corporations, partnerships, and/or individuals or a joint enterprise and/or venture that collectively comprise a debt adjustment[1] services operation targeting financially

---

[1] OCGA § 18-5-1(1) defines debt adjusting as follows:

> Debt adjusting means doing business in debt adjustments, budget counseling, debt management, or debt pooling service or holding oneself out, by words of similar import, as providing services to debtors in the management of their debts and contracting with a debtor for a fee to:

troubled consumers and extracting from individuals least able to afford it exorbitant fees for worthless services.

2.

Plaintiff pursues this action under the Georgia Debt Adjustment Act, OCGA §§ 18-5-1 *et seq.*, (hereinafter "GDAA").

3.

The Georgia General Assembly allows debt adjusting as long as it meets the consumer protection criteria set forth in the GDAA.  The debt adjuster is allowed to receive funds from the debtor and then in turn distribute payment to the debtor's individual creditors in accordance with a pre-determined agreement with each creditor.  In addition, the debt adjuster is allowed to withhold limited fees, not more than 7.5%, for itself under the GDAA.

4.

The Act makes clear that the fee charged by a debt adjuster for debt adjustment services is capped at 7.5% of the amount distributed monthly to the debtor's creditors

---

(A) Effect the adjustment, compromise, or discharge of any account, note, or other indebtedness of the debtor; or

(B) Receive from the debtor and disburse to his or her creditors any money or other thing of value.

(see OCGA § 18-5-2); and that all funds received from a Georgia debtor must be disbursed to the appropriate creditors, less any fees authorized by the GDAA, within 30 days of receipt of such funds (see OCGA § 18-5-3.2(a)); the GDAA declares that a violation of any of these provisions is a misdemeanor.  See OCGA § 18-5-4(a).

5.

Thus, the debt settlement services Defendants provided to Plaintiff are in direct violation of Georgia law and in no way comport with the GDAA.

6.

Plaintiff also pursues this action under the Credit Repair Organizations Act, ("CROA"), 15 U.S.C. § 1679.

7.

The Credit Repair Organizations Act ("CROA") states as its purpose:

> (1) to ensure that prospective buyers of the services of credit repair organizations are provided with the information necessary to make an informed decision regarding the purchase of such services; and

> (2) to protect the public from unfair or deceptive advertising and business practices by credit repair organizations.

15 U.S.C. § 1679(b).

8.

Defendants state:

THIS PROGRAM IS DESIGNED TO REMOVE DEROGATORY ITEMS FROM CREDIT REPORTS – IT WILL NOT REMOVE YOUR OBLIGATION TO PAY THE UNDERLYING DEBT.  YOUR CREDIT SCORE MAY OR MAY NOT GO UP ONCE THE PROCESS IS COMPLETED, DEPENDING ON HOW MUCH POSITIVE CREDIT YOU STILL HAVE ON YOUR FILE ONCE IT HAS BEEN CLEANED.

9.

Their self-described activities, if successful, necessarily result in credit repair, since a settled debt would reduce the consumer's debt-to-credit ratio (utilization), increase the consumer's credit score, and would appear on a credit report as paid, partly paid, or settled.

10.

Under CROA, "No person may -- . . . make or use any untrue or misleading representation of the services of the credit repair organization." 15 U.S.C. § 1679b(a)(3).

11.

Further, "No credit repair organization may charge or receive any money or other valuable consideration for the performance of any service which the credit repair organization has agreed to perform for any consumer before such service is fully performed."  15 U.S.C. § 1679b(b).

12.

Defendants repeatedly made untrue and misleading representations to Plaintiff by informing her that Defendants would it would settle her debts with her creditors, but instead Defendants lined their pockets with Plaintiff's money while doing little or nothing to truly assist Plaintiff.

13.

CROA states that:

> Any person who fails to comply with any provision of this title [15 U.S.C. §§ 1679 *et seq.*] with respect to any other person shall be liable to such person in an amount equal to the sum of the amounts determined under each of the following paragraphs:
>
> > (1) Actual damages.  The greater of—
> >
> > > (A) the amount of any actual damage sustained by such person as a result of such failure; or
> > >
> > > (B) any amount paid by the person to the credit repair organization.
> >
> > (2) Punitive damages.
> >
> > > (A) Individual actions.  In the case of any action by an individual, such additional amount as the court may allow.
> > >
> > > (B) Class actions.   In the case of a class action, the sum of—

> (i) the aggregate of the amount which the court may allow for each named plaintiff; and
>
> (ii) the aggregate of the amount which the court may allow for each other class member, without regard to any minimum individual recovery.
>
> (3) Attorneys' fees.  In the case of any successful action to enforce any liability under paragraph (1) or (2), the costs of the action, together with reasonable attorneys' fees.

15 U.S.C. § 1679g(a).

14.

Plaintiff also pursues this action under the Fair Business Practices Act, OCGA §§ 10-1-390 *et seq.*, (hereinafter "FBPA") which authorizes, in addition to all other remedies, recovery of actual damages, plus exemplary damages and, in the case of intentional violations of the FBPA, treble damages; personal liability of responsible corporate officers when a corporate defendant fails to pay a judgment within thirty days, and reasonable attorneys' fees and costs of litigation, because the GDAA provides that a violation of the GDAA is also a violation of the FBPA.[2]

---

[2] See OCGA § 18-5-4(d).

15.

Defendants promotes themselves in print, *via* the internet, and through public media as debt adjustment and settlement organizations that can negotiate a settlement of a client's unsecured debt for less than the amount owed and/or provides other debt solutions.

16.

When a potential client makes initial contact, Defendants collect the potential client's financial information, including account numbers for all unsecured debts. Once Defendants have this information, they persuade the client that through their many years of experience, their connections in the credit industry, and their financial savvy, Defendants can dramatically lower the client's debts and get the client out of debt quickly.

17.

Defendants exacerbated Plaintiff's already dire straits by advising her to cease payments to her creditors. Defendants placed themselves in a superior position to receive all of their fees from Plaintiff before any action would be taken on her behalf. Further, Defendants' advice and persuasion placed Plaintiff in the cross-hairs of multiple debt collection lawsuits.

18.

Thus, the debt settlement services Defendants provided to Plaintiff are in direct violation of Georgia law, in no way comport with the GDAA, and violate the FBPA (see OCGA 18-5-4(d)).

## PARTIES, JURISDICTION AND VENUE

19.

Plaintiff Vickie Phan is a domiciliary of the State of Georgia and of Gwinnett County.

20.

Defendant Peak Debt Consumption, LLC ("Peak Debt") is a Utah limited liability company with its principal place of business at 690 Highway 89, Suite 200, Jackson, Wyoming 83002.

21.

Peak Debt maintains its registered office at 1891 East Frontier Road, Salt Lake City, Utah, 84121-1321 and names as its registered agent, Chris E. McCormick. Peak Debt may be served with Summons and a copy of this Complaint at this address.

22.

Defendant Chris E. McCormick ("McCormick") is a domiciliary of the State of Utah and may be served with Summons and a copy of this Complaint at 1891 East Frontier Road, Salt Lake City, Utah, 84121-1321.

23.

McCormick is the principal, owner or president of Peak Debt and is responsible Peak Debt's daily operations.

24.

Defendant Credit Precision, Inc. ("Credit Precision") is a Georgia corporation duly registered with the Georgia Secretary of State with its principal place of business at 280 Interstate North Circle SE, Suite 500, Atlanta, GA, 30339.

25.

Credit Precision maintains its registered office at 280 Interstate North Circle SE, Suite 500, Atlanta, GA, 30339 and names as its registered agent, Mark Miller. Credit Precision may be served with Summons and a copy of this Complaint at this address.

26.

Defendant Mark Miller is a domiciliary of the State of Georgia and may be served with Summons and a copy of this Complaint at 651 Winsor Parkway N.E., Atlanta, Georgia 30343-2801.

27.

At all times relevant to this Complaint, Mark Miller and Credit Precision were acting as agents, principals, or employees of Defendant Peak Debt and worked in conjunction with Peak Debt.

28.

Miller is the principal, owner or president of Credit Precision and is responsible Credit Precision's daily operations.

29.

Defendant Fisher Law Group, PLLC ("Fisher Law") is a Utah professional limited liability company that maintains its principal place of business at 2825 East Cottonwood Parkway, Suite 500, Cottonwood Heights, Utah 84121.

30.

Fisher Law maintains its registered office at 2825 East Cottonwood Parkway, Suite 500, Cottonwood Heights, Utah 84121 and names David Fisher as its

registered agent.   Fisher Law may be served with Summons and a copy of this Complaint at this address.

31.

Defendant David Fisher in a Utah licensed attorney residing at 1328 Mountain Orchard Drive, Pleasant View, Utah, 84414 and may be served with Summons and a copy of this Complaint at this address.

32.

At all times relevant to this Complaint, David Fisher and Fisher Law were acting as agents, principals, or employees of Defendant Peak Debt and worked in conjunction with Peak Debt.

33.

Defendant Hegemon Group International, LLC ("Hegemon") is a Georgia limited liability company duly registered with the Georgia Secretary of State and maintains it principal office at P.O. Box 2985 Suwanee, Georgia 30024.

34.

Hegemon maintains its registered office at 400 Galleria Parkway, Suite 1500, Atlanta, Georgia 30339 and names as its registered agent, J.F. Tenney Law, LLC. Hegemon may be served with Summons and a copy of this Complaint at this address.

35.

At all times relevant to this Complaint, Hegemon was acting as an agent, a principal, or employee of Defendant Peak Debt and worked in conjunction with Peak Debt.

## **RELEVANT FACTS**

36.

Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully restated here and further states as follows:

37.

Prior to February 2018, Plaintiff underwent financial difficulties from an excess of $104,270.49 in unsecured consumer debt owed to ten (10) different creditors.

38.

Due to the interest rates charged by her unsecured creditors and the large amount owed on these accounts, Plaintiff experienced difficulties in paying her monthly financial obligations.

39.

Plaintiff met Ty Phoummithone, a regional marketing director for Defendant Hegemon, who introduced her to his client, Defendant Peak Debt, and persuaded her to engage Defendant Peak Debt for debt settlement and credit repair services.

40.

On or about February 26, 2017, Plaintiff engaged Peak Debt, McCormick, Fisher Law, David Fisher, Credit Precision, and Miller to perform debt settlement services and credit repair services on her behalf with her creditors.

41.

A true and accurate copy of the "Client Engagement Agreement" is attached hereto as Exhibit 1.

42.

Defendants explained to Plaintiff that they could assist her if she signed up with them for their "debt settlement" program, which consisted of Plaintiff providing all unsecured credit account information and balances, agreeing to not have any further contact with any of her creditors, and to begin paying various sums to Defendants, in amounts determined by Defendants, to settle Plaintiff's debts.

43.

Defendants divided Plaintiff's debts in "sets" which Defendants claimed to be settling in "batches" based on Plaintiff's ability to pay a minimum of thirty-five percent (35%) of the total amount owed to any particular "batch" of creditors.

44.

Plaintiff was required to pay an up-front "initial consultation retainer" to Defendants in the amount of $3,500.00 prior to any work being performed by Defendants.

45.

Plaintiff was required by Defendants to execute a "Joint Escrow Agreement" between Plaintiff, Fisher Law Group, PLLC and Peak Debt, which in relevant part stated:

> Fisher Law Group, PLLC (Attorney), Peak Debt Consumption, LLC (Peak) and Vickie Phan (Client), hereby agree to the following terms regarding all Client funds placed in escrow with Peak's then-current designated escrow for future payment of Attorney's and Peak's fees and dispersments [sic] to Client's creditors:
>
> 1. All funds initially placed by Client in escrow shall remain the Client's property until earned/converted and disbursed in accordance with these terms, and according to the parties' separate Debt Consumption Terms and Client Engagement Agreement ("Client Agreement").

2.  Client agrees that Escrow Agent shall honor all directions from Peak's then-current appointed contact person, regarding disbursements to be made to Attorney, Peak, Client's creditors, or other third parties whom Client and Peak agree should receive funds pursuant to the Client Agreement.

3.  Client agrees that it shall deposit into escrow 35% of the total amount presently owed to each creditor that Client wishes to enroll with Attorney and Peak for debt settlement and consumption.

4.  Attorney and Peak will take no action regarding any individual creditor for which Client has not deposited a full 35% of the total claimed by the creditor to be owed to the creditor.

5.  From the 35% of the total debt deposited into escrow, Attorney will withdraw 7% of the total owed to be paid to Attorney and Peak according to terms of a separate agreement between Attorney and Peak.

6.  This will leave 28% of the total debt remaining in escrow available for distribution as settlements are reached with each creditor.

Joint Escrow Agreement is attached hereto as Exhibit 2.

46.

To this end, Defendants persuaded Plaintiff to transfer funds to them in excess of $34,000.00 by having Plaintiff deposit said funds at various times beginning in early 2017 and into 2019 directly into Defendants' bank account.

47.

The funds were deposited directly by Plaintiff into an "escrow" account under the name of "Deep Creek, LLC" held at a Chase Bank in Salt Lake City, Utah.

48.

As stated in the "Client Engagement Agreement," Defendants also engaged in credit repair services:

> Peak is working with Credit Precision - a credit repair partner - to provide help to the Client in getting their credit history as accurate as possible. Peak has negotiated with Credit Precision to provide this service as an additional product offering in connection with Peak's services performed for the Client.
>
> . . .
>
> 9. Credit Repair Services. Client acknowledges that Peak's credit repair service provider, Credit Precision, will perform credit repair activities for the Client, and Client hereby authorizes Credit Precision to obtain copies of Client's credit information from Peak or any credit reporting agency as necessary, in order to perform repair activities for the Client. With respect to the credit repair services that Credit Precision will perform for Client, Client hereby authorizes Credit Precision to receive payments from the escrow account by Peak as credit repair services are performed. Details of payment, possible rights of refund, and other credit repair details will be outlined in separate Credit Repair agreement between Client and Credit Precision.

Exhibit 1.

49.

Plaintiff received and executed the "Credit Repair Services Agreement" with Credit Precision on or about February 26, 2018, wherein it states, "The total amount Peak will disburse on your behalf is $750 - paid from time to time directly from the escrow account as repair services are performed."

50.

The "Credit Repair Services Agreement" is attached hereto as Exhibit 3.

51.

None of the purported credit repair services were performed as promised, yet Credit Precision and Defendant Mark Miller, in conjunction with the other Defendants collected their fees from Plaintiff.

## THE CREDIT REPAIR ORGANIZATIONS ACT, 15 U.S.C. § 1679

52.

Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully restated here and further states as follows:

53.

The Credit Repair Organizations Act ("CROA") states as its purpose:

> (1) to ensure that prospective buyers of the services of credit repair organizations are provided with the information necessary to make an informed decision regarding the purchase of such services; and

(2) to protect the public from unfair or deceptive advertising and business practices by credit repair organizations.

15 U.S.C. § 1679(b).

54.

Plaintiff is a consumer within the definition of CROA. 15 U.S.C. § 1679(a)(1).

55.

Defendants are "credit repair organizations" within the definition of CROA, as Defendants are:

[a] person who uses any instrumentality of interstate commerce or the mails to sell, provide, or perform (or represent that such person can or will sell, provide, or perform) any service, in return for the payment of money or other valuable consideration, for the express or implied purpose of—

(i) improving any consumer's credit record, credit history, or credit rating; or

(ii) providing advice or assistance to any consumer with regard to any activity or service described in clause (i)[.]

15 U.S.C. § 1679a(3)(A).

56.

As stated previously, Defendants' self-described activities, if successful, necessarily result in credit repair, since a settled debt would reduce the consumer's debt-to-credit ratio (utilization), increase the consumer's credit score, and would appear on a credit report as paid, partly paid, or settled.

57.

Under CROA, "No person may -- . . . make or use any untrue or misleading representation of the services of the credit repair organization." 15 U.S.C. § 1679b(a)(3).

58.

Further, "No credit repair organization may charge or receive any money or other valuable consideration for the performance of any service which the credit repair organization has agreed to perform for any consumer before such service is fully performed." 15 U.S.C. § 1679b(b).

59.

Defendants repeatedly made untrue and misleading representations to Plaintiff by informing her that Defendants would settle her debts with her creditors, but instead Defendants lined their pockets with Plaintiff's money while doing little or nothing to truly assist Plaintiff.

60.

CROA states that:

> Any person who fails to comply with any provision of this title [15 U.S.C. §§ 1679 *et seq.*] with respect to any other person shall be liable to such person in an amount equal to the sum of the amounts determined under each of the following paragraphs:
>
>> (1) Actual damages. The greater of—
>>
>>> (A) the amount of any actual damage sustained by such person as a result of such failure; or
>>>
>>> (B) any amount paid by the person to the credit repair organization.
>>
>> (2) Punitive damages.
>>
>>> (A) Individual actions. In the case of any action by an individual, such additional amount as the court may allow.

15 U.S.C. § 1679g(a).

61.

Further, CROA also invalidates any and all waivers of Plaintiff's rights pursuant to 15 U.S.C. § 1679f:

> (a) Consumer waivers invalid.   Any waiver by any consumer of any protection provided by or any right of the consumer under this title [15 USCS §§ 1679 et seq.]—
>
> (1) shall be treated as void; and

(2) may not be enforced by any Federal or State court or any other person.

(b) Attempt to obtain waiver.  Any attempt by any person to obtain a waiver from any consumer of any protection provided by or any right of the consumer under this title [15 USCS §§ 1679 et seq.] shall be treated as a violation of this title [15 USCS §§ 1679 et seq.].

(c) Contracts not in compliance.  Any contract for services which does not comply with the applicable provisions of this title [15 USCS §§ 1679 et seq.]—

(1) shall be treated as void; and

(2) may not be enforced by any Federal or State court or any other person.

15 U.S.C. § 1679f.

62.

Thus, Defendants' attempts to enforce their class action waivers pursuant to the "Client Engagement Agreement" or their "Credit Repair Services Agreement" are invalid and unenforceable.

## **GEORGIA DEBT ADJUSTMENT ACT**

63.

Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully restated here and further states as follows:

64.

The GDAA at OCGA § 18-5-1, defines debt adjusting as:

> [D]oing business in debt adjustments, budget counseling, debt management, or debt pooling service or holding oneself out, by words of similar import, as providing services to debtors in the management of their debts and contracting with a debtor for a fee to:
>
> (A) Effect the adjustment, compromise, or discharge of any account, note or other indebtedness of the debtor;
>
> (B) Receive from the debtor and disburse to his or her creditors any money or other thing of value.

65.

From its initial creation by the Georgia General Assembly in 1956 until its amendment of July 1, 2003, the GDAA stated that "[i]t shall be unlawful for any person to engage in the business of debt adjusting" and that **"[a]ny person who engages in the business of debt adjusting . . . shall be guilty of a misdemeanor**." OCGA § 18-5-2 (1956) (emphasis added).

66.

Thus, the original GDAA undeniably closed and locked the door for persons to offer debt adjusting for a fee in this state, unless incidental to the practice of law.

67.

In 2003, the General Assembly substantially amended the GDAA.  In the amendment's enabling clause, the legislature stated that the purpose is:

> To limit the maximum charge that may be imposed for the provision of debt adjustment services; to provide for definitions; to provide for exemptions from those provisions related to debt adjustment; to require persons engaged in debt adjusting to obtain an annual audit of all accounts and to maintain a certain amount and type of insurance coverage; to provide for the disbursement of a debtor's funds within 30 days of receipt; to require persons engaged in debt adjusting to maintain trust accounts for debtors' funds; to provide for civil and criminal violations and penalties; to provide for investigation and enforcement; to provide for related matters; to provide for an effective date; to repeal conflicting laws; and for other purposes.

2003 Ga. Laws No. 103 p. 392 (House Bill No. 385).

68.

The amended GDAA thus removed the out-and-out prohibition on debt adjusting for a fee and cracked the door to allow debt adjusters to operate in Georgia as long as the Act's mandates are followed.

69.

The amended GDAA commands that the debt adjuster "*shall* maintain a separate trust account for the receipt of any and all funds from debtors and the disbursement of such funds on behalf of debtors" (OCGA § 18-5-3.2(b)); "*shall*

disburse to the appropriate creditors all funds received from the debtor, less any fees authorized by [the Act], within thirty days of receipt" (OCGA § 18-5-3.2(a)); "*shall* obtain annual audits from independent CPAs on all accounts in which Georgia debtors' funds have been deposited" (OCGA § 18-s-3.1(a)(1)); "*shall* obtain a specified level of insurance coverage for employee dishonesty depositor's forgery and computer fraud" (OCGA § 18-5-3.1(a)(2)); and "*shall not*:

> accept from a debtor who resides in this state, either directly or indirectly, any charge, fee, contribution, or combination thereof in an amount in excess of 7·5 percent of the amount paid monthly by such debtor to such person for distribution to creditors of such debtor . . .

OCGA § 18-5-2 (emphasis added).

70.

The amendment further provided for a civil remedy for a person's violation of the GDAA.  OCGA § 18-5-4 states:

> Any person who engages in debt adjusting in violation of the provisions of [OCGA § 18-5-2 or § 18-5-3.2(a)] shall further be liable to the debtor in an amount equal to the total of all fees, charges, or contributions paid by the debtor plus $5,000.00.  Such debtor shall have the right to bring a cause of action directly against such person for violation of the provisions of this chapter.

## VIOLATION OF GEORGIA'S DEBT ADJUSTMENT ACT

71.

Plaintiff incorporates each of the foregoing paragraphs as if fully restated herein.

72.

Defendants are engaged in the business of providing "Debt Adjusting" services as that term is defined in OCGA § 18-5-1.

73.

Defendants provided Debt Adjusting services to Plaintiff while she resided in the state of Georgia.

74.

Defendants contracted for and accepted from Plaintiff a charge, fee, contribution, or combination thereof in an amount in excess of 7.5% of the amount they paid monthly for distribution to Plaintiff's creditors.

75.

Defendants' conduct is criminal and violates the provisions of the GDAA, and specifically OCGA § 18-5-2.

76.

From February 2017 through 2019, Defendants received from Plaintiff moneys for the payment of her creditors which Defendants retained for more than thirty (30) days.

77.

The Defendants violated OCGA § 18-5-3.2(a) by holding the moneys Plaintiff paid for distribution to Plaintiff's creditors for more than thirty (30) days.

78.

Due to said violations of the GDAA, pursuant to OCGA § 18-5-4(b)(2), the Defendants are liable to Plaintiff in an amount equal to the total of all fees, charges, and/or contributions paid by Plaintiffs to the Defendants, plus statutory damages in the amount of $5,000.00.

## **VIOLATION OF THE FBPA**

79.

Plaintiff incorporates each of the foregoing paragraphs as if fully restated herein.

80.

Defendants' violations of the GDAA also violated the FBPA.

81.

Defendants intentionally violated the FBPA when it violated the GDAA.

82.

Defendants are therefore liable to Plaintiff, in addition to their remedies under the GDAA, for their actual damages, for treble their actual damages for the Defendants' intentional violation of the FBPA, and for exemplary damages, plus reasonable attorneys' fees and costs of litigation.

## GEORGIA'S STATE PROCEDURAL PROHIBITION ON CLASS ACTIONS PURSUANT TO THE FBPA IS PRE-EMPTED BY FED. R. CIV. P. 23

83.

Plaintiff incorporates each of the foregoing paragraphs as if fully restated herein.

84.

The FBPA, at OCGA § 10-1-399(a), states:

> Any person who suffers injury or damages as a result of a violation of Chapter 5B of this title, as a result of consumer acts or practices in violation of this part, as a result of office supply transactions in violation of this part or whose business or property has been injured or damaged as a result of such violations ***may bring an action individually, but not in a representative capacity***, against the person or persons engaged in such violations under the rules of civil procedure to seek equitable injunctive relief and to recover his or her general and exemplary damages sustained as a

consequence thereof in any court having jurisdiction over the defendant[.]

Emphasis supplied.

85.

However, as the United States Supreme Court held in <u>Shady Grove</u>

<u>Orthopedic Assocs., P.A. v. Allstate Ins. Co.</u>, 559 U.S. 393 (2010):

> [Fed. R Civ. P. 23] says that if the prescribed preconditions are satisfied "[a] class action may be maintained" (emphasis added)--not "a class action may be permitted." Courts do not maintain actions; litigants do. The discretion suggested by Rule 23's "may" is discretion residing in the plaintiff: He may bring his claim in a class action if he wishes. And like the rest of the Federal Rules of Civil Procedure, Rule 23 automatically applies "in all civil actions and proceedings in the United States district courts," Fed. Rule Civ. Proc. 1.

Id. at 400.

> In sum, it is not the substantive or procedural nature or purpose of the affected state law that matters, but the substantive or procedural nature of the Federal Rule. We have held since <u>Sibbach [v. Wilson & Co.</u>, 312 U.S. 1, 14 (1941)], and reaffirmed repeatedly, that the validity of a Federal Rule depends entirely upon whether it regulates procedure.

Id. at 410.

86.

Further, the Eleventh Circuit held in <u>Lisk v. Lumber One Wood Preserving,</u> <u>LLC</u>, 792 F.3d 1331 (11th Cir. 2015):

> This appeal presents two issues.  The first arises from a conflict between Federal Rule of Civil Procedure 23, which authorizes class actions including for consumer claims of this kind, and the ADTPA[3], which creates a private right of action but forbids private class actions.  We hold that Rule 23 controls.

87.

Thus, any prohibition under Georgia's FBPA to the implication of Fed. R. Civ. P. 23 has been abolished, and this matter may proceed as a class action in federal court.

## **CLASS ALLEGATIONS**

88.

Plaintiff seeks to have this Court certify the following classes:

### **CLASS 1**

> All persons who, while residing in the state of Georgia, received debt settlement or debt adjusting services from Defendants on or after July 1, 2003 and from whom Defendants accepted, directly or indirectly, any charge, fee, contribution, or combination thereof.

---

[3] The Alabama Deceptive Trade Practices Act ("ADTPA") is Alabama's equivalent law to Georgia's Fair Business Practices Act.

## CLASS 2

All persons, while residing in the state of Georgia, contracted for credit repair services from Defendants, beginning five (5) years prior to the filing of this Complaint to the present, and Defendants accepted a fee for said services before the services were rendered.

89.

On information and belief, the named Plaintiff and the Plaintiff Class Members were solicited by Defendants through a standard marketing scheme through which the Defendants offered Debt Adjustment services and credit repair services through Defendants' standard scheme.  Such marketing and services are typical of those experienced by the Plaintiff and the proposed Plaintiff Class Members.

90.

Defendants commonly targeted Georgia residents for Debt Adjustment services and credit repair services from the payment of fees to other marketing entities, such as Defendant Hegemon

91.

On information and belief, the fees collected by the Defendants from the proposed Plaintiff Class Members are uniformly assessed to every customer of

Defendants and can readily be determined from a ministerial review of the records of the Defendants.

92.

On information and belief, the contracts entered into between Defendants and Plaintiff are standard contracts which are substantially the same as the contracts Defendants entered into with the Plaintiff Class Members.

93.

The names and addresses of the Plaintiff Class Members can readily be determined from a ministerial review of the records of the Defendants and through the account statements of the Defendants pertaining to collection of such charges, fees, contributions, or combinations thereof.

94.

The membership of the classes is numerous and joinder of individual plaintiffs is impractical.  On information and belief, the Defendants have provided Debt Adjustment services and credit repair services to over hundreds of residents of the State of Georgia since July 1, 2003 (in the case of Debt Adjustment services), and hundreds of residents in the past five (5) years (in the case of credit repair services).

95.

There are questions of law and fact common to all members of the Plaintiff classes, and these common questions of law and fact predominate over any individual issues.  The principle questions pertinent to the classes as a whole include:

a) Whether the Defendants' standard means of doing business in debt adjustments, debt settlement, debt reduction, budget counseling, and debt management constitutes "Debt Adjustment" under OCGA § 18-5-1;

b) Whether Defendants violated OCGA § 18-5-2 by accepting excessive fees from Plaintiff Class Members for the provision of Debt Adjustment services;

c) Whether Defendants violated OCGA § 18-5-3.2(a) by failing to "disburse to the appropriate creditors all funds received from the debtor . . . within thirty days of receipt";

d) Whether Defendants fraudulently and materially misrepresented their ability to adjust or resolve the debts of the Plaintiff Class Members;

e) Whether Defendants breached their fiduciary duty by failing to comply with the Georgia Debt Adjustment Act, by misrepresenting the willingness of creditors to resolve class member debt through debt

settlement, by misrepresenting the ability of Defendants to resolve class member debts, by failing to secure agreements with creditors of the class members to resolve their debts, and by performing no service of value for the fees the Defendants received;

f) Whether the Defendants violated CROA by misrepresenting that the credit repair services offered were actually being performed;

g) The liability of the Defendants for violations of the Georgia Debt Adjustment Act;

h) The liability of the Defendants for violations of the Credit Repair Organizations Act;

i) The liability of the Defendants for violations of the Fair Business Practices Act;

j) The appropriate measure of damages and the appropriate remedies;

k) Defenses raised by the Defendants;

l) The availability of statutory damages pursuant to OCGA § 18-5-4;

m) The availability of actual damages pursuant to 15 U.S.C. § 1679g;

n) The appropriateness of punitive damages pursuant to 15 U.S.C. § 1679g;

o) The availability of actual damages the Defendants' intentional violation of the FBPA pursuant to OCGA § 10-1-399;

p) The availability of trebled actual damages for the Defendants' intentional violation of the FBPA pursuant to OCGA § 10-1-399; and

q) The availability of reasonable attorneys' fees and costs of litigation for the Defendants' intentional violation of the FBPA pursuant to OCGA § 10-1-399.

96.

The claims of the named Plaintiff are typical of the claims of the Plaintiff Class Members, which all arise from the same operative facts and are based on the same legal theory, and Plaintiff's claims will thus adequately represent those of the Plaintiff Class Members.

97.

The named Plaintiff will fairly and adequately protect the interests of the Plaintiff Class Members.  Plaintiff has retained counsel with experience in class action litigation, and they are not aware of any interest that might cause them not to vigorously pursue this case.

98.

A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder is impracticable.  The expense and burden of individual litigation make it virtually impossible for the members of the class to proceed individually, and it is therefore most efficient to resolve all claims based on the Defendants' conduct in one forum.

99.

The Plaintiff is aware of no difficulties that will be encountered in the management of this litigation that would render the action unmanageable.  This is not a class action that will require an analysis of the Defendants' conduct as to individual class members.

100.

Prosecution of separate actions by individual Plaintiff Class Members would create adjudications that would be dispositive of the interests of the other members not parties to the adjudication.  Plaintiff is not aware of any other pending actions against these Defendants for these same causes of action.

101.

Without a class action mechanism, members of the Plaintiff Class would be substantially impaired or impeded in their ability to protect their interests.  The value

of claims of the individual class members would be in an amount that makes prosecution outside of the class action uneconomical.

102.

A final judgment on the merits of the named Plaintiff's claims would be fully dispositive of the claims and interests of those similarly situated who are not specifically named as a plaintiff in this action.

**WHEREFORE**, Plaintiff being entitled to a trial by jury and judgment against Defendants, prays for the following:

a) That summons be directed to Defendants and served upon it as provided by law;

b) That Plaintiff be designated class representatives for Class I and Class II as defined herein;

c) That Plaintiff's counsel be designated class counsel for Class I and Class II as defined herein;

d) That the Class I be certified for all persons who, while residing in the state of Georgia, received debt settlement or debt adjusting services from Defendants on or after July 1, 2003 and from whom Defendants accepted, directly or indirectly, any charge, fee, contribution, or combination thereof;

e) That the Class II certified for all persons, while residing in the state of Georgia, contracted for credit repair services from Defendants, beginning five (5) years prior to the filing of this Complaint to the present, and Defendants accepted a fee for said services before the services were rendered;

f) That the Court hold a hearing as soon as practicable for the determination of class certification for Class I and Class II in accordance with Fed.R. Civ. P. 23;

g) For each violation of OCGA §§ 18-5-1 *et seq.* by Defendants, that the Plaintiffs and the members of Class I be awarded an amount equal to all charges, fees, contributions, or combinations therefore paid to Defendants plus $5,000.00 as allowed under OCGA §§ 18-5-1 *et seq.*;

h) For violations of the FBPA, that Plaintiff and the members of Class I be awarded their actual damages, trebled damages, exemplary damages, and reasonable attorney's fees and costs;

i) For each violation of the 15 U.S.C. § 1679 committed by Defendants, that the Plaintiff and the members of Class II be awarded an amount equal to their actual damages, punitive damages in an amount that the Court may allow, and attorneys' fees and costs of the action;

j)  That Defendants be required to pay all monies herein referred to in subparagraph g) and h) into a common fund for the benefit of Class I, less expenses and attorneys' fees;

k)  That Defendants be required to pay all monies herein referred to in subparagraph i) into a common fund for the benefit of Class II, less expenses and attorneys' fees;

l)  That the Court conduct a "fairness hearing," after due and proper notice to all members of Class I and Class II, and make such award of attorneys' fees and expenses as the Court deems appropriate from the common funds (as above referred to) and/or from Defendants;

m) That Plaintiff, individually and as class representatives for Class I and Class II, have a trial by jury;

n)  That Plaintiff and the members of Class I and Class II be awarded interest on any award granted, with such interest accruing from the time of the filing of this Complaint until the time final Judgment in this case is paid;

o)  That Plaintiff be awarded an incentive award from Defendants for the benefit the named Plaintiff has conferred on the Class I and Class II members through her commitment of time and expense in conducting this lawsuit; and

p) That Plaintiff, individually and as class representatives of all others similarly situated as Class I and Class II, have such other relief as this Court deems proper.

Respectfully submitted, this 10th day of October, 2019.

**HURT STOLZ, P.C.**

/s/  James W. Hurt, Jr.
By:  James W. Hurt, Jr.
Georgia Bar No.:  380104

1551 Jennings Mill Road, Suite 3100-B
Watkinsville, Georgia 30677
(706) 395-2750
Facsimile: (866) 766-9245
jhurt@hurtstolz.com

**DEWOSKIN LAW FIRM, LLC**

/s/Daniel DeWoskin
By:  Daniel DeWoskin
Georgia Bar No. 220327
Sam Han
Georgia Bar No. 322284

535 N. McDonough Street
Decatur, Georgia 30030
(404) 987-0026
Facsimile:  (404) 920-3341
dan@atlantatrial.com

**ATTORNEYS FOR PLAINTIFFS**

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local R. 7.1(D), this is to certify that the foregoing complies with the font and point setting approved by the Court in LR 5.1(B).  The foregoing COMPLAINT FOR DAMAGES IN CLASS ACTION was prepared on a computer, using Times New Roman 14 point font.

Respectfully submitted, this 10th day of October, 2019.

**HURT STOLZ, P.C.**

/s/  James W. Hurt, Jr.
By:  James W. Hurt, Jr.
Georgia Bar No.:  380104

1551 Jennings Mill Road, Suite 3100-B
Watkinsville, Georgia 30677
(706) 395-2750
Facsimile: (866) 766-9245
jhurt@hurtstolz.com

**DEWOSKIN LAW FIRM, LLC**

/s/Daniel DeWoskin
By:  Daniel DeWoskin
Georgia Bar No. 220327
Sam Han
Georgia Bar No. 322284

535 N. McDonough Street
Decatur, Georgia 30030
(404) 987-0026
Facsimile:  (404) 920-3341
dan@atlantatrial.com

**ATTORNEYS FOR PLAINTIFFS**