IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| VICKIE PHAN, individually and Behalf of all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | CIVIL ACTION NUMBER: |
| v. | ) ) | 1:19-CV-4613-JPB |
| PEAK DEBT CONSUMPTION, LLC CHRIS MCCORMICK, FISHER LAW GROUP, PLLC, DAVID FISHER, and HEGEMON GROUP INTERNATIONAL, LLC, | ) ) ) ) ) ) | COMPLAINT – CLASS ACTION JURY TRIAL DEMANDED |
| Defendants. | ) ) ) | |

**FIRST AMENDED COMPLAINT IN CLASS ACTION FOR DAMAGES**

COMES NOW, Plaintiff Vickie Phan, individually and on behalf of all others similarly situated, and files this, her First Amended Complaint in Class Action for Damages pursuant to the Credit Repair Organizations Act, ("CROA"), 15 U.S.C. § 1679, the Georgia Debt Adjustment Act, OCGA § 18-5-1 *et seq*., and the Georgia Fair Business Practices Act, OCGA § 10-1-390 *et seq*., against Peak Debt Consumption, LLC, Chris McCormick (collectively "Peak Debt"), Fisher Law Group, PLLC, David Fisher, (collectively "Fisher") and Hegemon Group International, LLC ("HGI") and shows this Honorable Court the following:

This First Amended Complaint is being filed pursuant to Fed. R. Civ. P. 15(a)(1)(B), as it is being filed within 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier.

## INTRODUCTION

The Defendants are in the business of ripping off vulnerable people. Defendants took advantage of this Plaintiff who got behind on her bills and reached out for help from Defendants who fraudulently represented that Defendants could settle Plaintiff's debt for a fraction of what was owed, and then lined their pockets with Plaintiff's money rather than assisting her. What Defendants have done is criminal and reprehensible. Defendants should be forced to compensate Plaintiff and be punished so that they cease their illegal scheme.

1.

Defendants are a collection of interrelated entities, limited liability companies, corporations, partnerships, and/or individuals or a joint enterprise and/or venture that collectively comprise a debt adjustment[1] marketing and services operation targeting

---

[1] OCGA § 18-5-1(1) defines debt adjusting as follows:

> Debt adjusting means doing business in debt adjustments, budget counseling, debt management, or debt pooling service or holding oneself out, by words of similar import, as providing services to debtors in the management of their debts and contracting with a debtor for a fee to:

financially troubled consumers and extracting from individuals least able to afford it exorbitant fees for worthless services.

2.

Plaintiff pursues this action under the Credit Repair Organizations Act, 15 U.S.C. § 1679 *et. seq.* (hereinafter "CROA").

3.

CROA states as its purpose:

> (1) to ensure that prospective buyers of the services of credit repair organizations are provided with the information necessary to make an informed decision regarding the purchase of such services; and

> (2) to protect the public from unfair or deceptive advertising and business practices by credit repair organizations.

15 U.S.C. § 1679(b).

4.

Plaintiff also pursues this action under the Georgia Debt Adjustment Act, OCGA §§ 18-5-1 *et seq.*, (hereinafter "GDAA").

_____

> (A) Effect the adjustment, compromise, or discharge of any account, note, or other indebtedness of the debtor; or

> (B) Receive from the debtor and disburse to his or her creditors any money or other thing of value.

5.

The Georgia General Assembly allows debt adjusting as long as it meets the consumer protection criteria set forth in the GDAA. The debt adjuster is allowed to receive funds from the debtor and then in turn distribute payment to the debtor's individual creditors in accordance with a pre-determined agreement with each creditor. In addition, the debt adjuster is allowed to withhold limited fees, not more than 7.5%, for itself under the GDAA.

6.

The GDAA makes clear that the fee charged by a debt adjuster for debt adjustment services is capped at 7.5% of the amount distributed monthly to the debtor's creditors (see OCGA § 18-5-2); and that all funds received from a Georgia debtor must be disbursed to the appropriate creditors, less any fees authorized by the GDAA, within 30 days of receipt of such funds (see OCGA § 18-5-3.2(a)); the GDAA declares that a violation of any of these provisions is a misdemeanor. See OCGA § 18-5-4(a).

7.

Thus, the debt settlement services marketed by HGI and  provided by Peak Debt and Fisher to Plaintiff are in direct violation of Georgia law and in no way comport with the GDAA.

8.

Peak Debt Consumption states in its "Peak Credit File Mastery Agreement":

> THIS PROGRAM IS DESIGNED TO REMOVE
> DEROGATORY ITEMS FROM CREDIT REPORTS –
> IT WILL NOT REMOVE YOUR OBLIGATION TO
> PAY THE UNDERLYING DEBT. YOUR CREDIT
> SCORE MAY OR MAY NOT GO UP ONCE THE
> PROCESS IS COMPLETED, DEPENDING ON HOW
> MUCH POSITIVE CREDIT YOU STILL HAVE ON
> YOUR FILE ONCE IT HAS BEEN CLEANED.

See "Peak Credit File Mastery Agreement" attached hereto as Exhibit 1.

9.

Peak Debt's self-described activities, if successful, necessarily result in credit repair, since a settled debt would reduce the consumer's debt-to-credit ratio (utilization), increase the consumer's credit score, and would appear on a credit report as paid, partly paid, or settled.

10.

Under CROA, "No person may -- . . . make or use any untrue or misleading representation of the services of the credit repair organization." 15 U.S.C. § 1679b(a)(3).

11.

Further, "No credit repair organization may charge or receive any money or other valuable consideration for the performance of any service which the credit repair organization has agreed to perform for any consumer before such service is fully performed." 15 U.S.C. § 1679b(b).

12.

Peak Debt and Fisher repeatedly made untrue and misleading representations to Plaintiff by informing her that Peak Debt and Fisher would it would settle her debts with her creditors, but instead Peak Debt and Fisher lined their pockets with Plaintiff's money while doing little or nothing to truly assist Plaintiff.

13.

CROA states that:

> Any person who fails to comply with any provision of this title [15 U.S.C. §§ 1679 *et seq.*] with respect to any other person shall be liable to such person in an amount equal to the sum of the amounts determined under each of the following paragraphs:

(1) Actual damages. The greater of—

> (A) the amount of any actual damage sustained by such person as a result of such failure; or

> (B) any amount paid by the person to the credit repair organization.

(2) Punitive damages.

> (A) Individual actions. In the case of any action by an individual, such additional amount as the court may allow.

> (B) Class actions. In the case of a class action, the sum of—

>> (i) the aggregate of the amount which the court may allow for each named plaintiff; and

>> (ii) the aggregate of the amount which the court may allow for each other class member, without regard to any minimum individual recovery.

(3) Attorneys' fees. In the case of any successful action to enforce any liability under paragraph (1) or (2), the costs of the action, together with reasonable attorneys' fees.

15 U.S.C. § 1679g(a).

14.

Plaintiff also pursues this action under the Fair Business Practices Act, OCGA §§ 10-1-390 *et seq*., (hereinafter "FBPA") which authorizes, in addition to

all other remedies, recovery of actual damages, plus exemplary damages and, in the case of intentional violations of the FBPA, treble damages; personal liability of responsible corporate officers when a corporate defendant fails to pay a judgment within thirty days, and reasonable attorneys' fees and costs of litigation, because the GDAA provides that a violation of the GDAA is also a violation of the FBPA.[2]

15.

HGI, Peak Debt, and Fisher promotes themselves in print, *via* the internet, and through public media as debt adjustment and settlement organizations that can negotiate a settlement of a client's unsecured debt for less than the amount owed and/or provides other debt solutions.

16.

After being directed by HGI to Peak Debt and Fisher,  Peak Debt and Fisher collect the potential client's financial information, including account numbers for all unsecured debts. Once Peak Debt and Fisher have this information, they persuade the client that through their many years of experience, their connections in the credit industry, and their financial savvy,  Peak Debt and Fisher can dramatically lower the client's debts and get the client out of debt quickly.

---

[2] See OCGA § 18-5-4(d).

17.

Peak Debt and Fisher exacerbated Plaintiff's already dire straits by advising her to cease payments to her creditors. Peak Debt and Fisher placed themselves in a superior position to receive all of their fees from Plaintiff before any action would be taken on her behalf. Further, Peak Debt and Fisher's advice and persuasion placed Plaintiff in the cross-hairs of multiple debt collection lawsuits.

18.

Thus, the debt settlement services Peak Debt and Fisher provided to Plaintiff are in direct violation of Georgia law, in no way comport with the GDAA, and violate the FBPA (see OCGA § 18-5-4(d)).

**PARTIES, JURISDICTION AND VENUE**

19.

Plaintiff Vickie Phan is a domiciliary of the State of Georgia and of Gwinnett County.

20.

Defendant Peak Debt is a Utah limited liability company with its principal place of business at 690 Highway 89, Suite 200, Jackson, Wyoming 83002.

21.

Peak Debt maintains its registered office at 1891 East Frontier Road, Salt Lake City, Utah, 84121-1321 and names as its registered agent, Chris E. McCormick. Peak Debt has been served with Summons and a copy of this Complaint at this address.

22.

Defendant Chris E. McCormick ("McCormick") is a domiciliary of the State of Utah and has been served with Summons and a copy of this Complaint at 1891 East Frontier Road, Salt Lake City, Utah, 84121-1321.

23.

McCormick is the principal, owner or president of Peak Debt and is responsible Peak Debt's daily operations.

24.

Non-party Credit Precision, Inc. ("Credit Precision") is a Georgia corporation duly registered with the Georgia Secretary of State with its principal place of business at 280 Interstate North Circle SE, Suite 500, Atlanta, GA, 30339.

25.

Non-party Credit Precision maintained its registered office at 280 Interstate North Circle SE, Suite 500, Atlanta, GA, 30339 and named as its registered agent,

Mark Miller. Credit Precision has been served with Summons and a copy of this Complaint at this address.

26.

Credit Precision was recruited by Peak Debt to perform Credit Repair services on behalf of Peak Debt's clients, and Peak Debt charged credit repair fees to its clients, prior to any credit repair being performed, under the guise that Credit Precision had undertaken the work.

27.

Defendant Fisher Law Group, PLLC ("Fisher Law") is a Utah professional limited liability company that maintains its principal place of business at 2825 East Cottonwood Parkway, Suite 500, Cottonwood Heights, Utah 84121.

28.

Fisher Law maintains its registered office at 2825 East Cottonwood Parkway, Suite 500, Cottonwood Heights, Utah 84121 and names David Fisher as its registered agent. Fisher Law has been served with Summons and a copy of this Complaint at this address.

29.

Defendant David Fisher in a Utah licensed attorney residing at 1328 Mountain Orchard Drive, Pleasant View, Utah, 84414 and has been served with Summons and a copy of this Complaint at this address.

30.

At all times relevant to this Complaint, David Fisher and Fisher Law were acting as agents, principals, or employees of Defendant Peak Debt and worked in conjunction with Peak Debt in providing debt adjustment services.

31.

Defendant Hegemon Group International, LLC ("HGI") is a Georgia limited liability company duly registered with the Georgia Secretary of State and maintains it principal office at P.O. Box 2985 Suwanee, Georgia 30024.

32.

HGI maintains its registered office at 400 Galleria Parkway, Suite 1500, Atlanta, Georgia 30339 and names as its registered agent, J.F. Tenney Law, LLC. Hegemon has been served with Summons and a copy of this Complaint at this address.

33.

At all times relevant to this Complaint, HGI was acting as an agent, a principal, or employee of Defendant Peak Debt and worked in conjunction with Peak Debt to actively market Peak Debt's and Fisher's debt adjustment services to debtors, including Plaintiff.

34.

To this day, one of HGI's Facebook pages continues to actively promote Defendant Peak Debt by stating "Tired of those unsecured debt? There's a way out. Message me for details."   This HGI Facebook page can be found at: https://www.facebook.com/tongyang.hgi/videos/400484130398620/.

35.

The Court has jurisdiction pursuant to 15 U.S.C. § 1679g; 28 U.S.C. § 1331, and § 1367.

36.

Venue is appropriate in the Northern District of Georgia because the Plaintiff resides within the judicial district, a substantial part of the events giving rise to the claim occurred within the district, and all of the named Defendants transact business here.

## RELEVANT FACTS

37.

Prior to February 2018, Plaintiff underwent financial difficulties from an excess of $104,270.49 in unsecured consumer debt owed to ten (10) different creditors.

38.

Due to the interest rates charged by her unsecured creditors and the large amount owed on these accounts, Plaintiff experienced difficulties in paying her monthly financial obligations.

39.

Plaintiff met Ty Phoummithone, a regional marketing director for Defendant HGI, who introduced Plaintiff to  Defendants Peak Debt and Fisher, and persuaded Plaintiff to engage Defendant Peak Debt and Fisher for debt settlement and credit repair services.

40.

On or about February 26, 2017, Plaintiff engaged Peak Debt and Fisher to perform debt settlement services and credit repair services on her behalf with her creditors.

41.

A true and accurate copy of the "Client Engagement Agreement" is attached hereto as Exhibit 2.

42.

Peak Debt and Fisher explained to Plaintiff that they could assist her if she signed up with them for their "debt settlement" program, which consisted of Plaintiff providing all unsecured credit account information and balances, agreeing to not have any further contact with any of her creditors, and to begin paying various sums to Peak Debt and Fisher, in amounts determined by Peak Debt and Fisher, to settle Plaintiff's debts.

43.

Peak Debt and Fisher divided Plaintiff's debts in "sets" which Peak Debt and Fisher claimed to be settling in "batches" based on Plaintiff's ability to pay a minimum of thirty-five percent (35%) of the total amount owed to any particular "batch" of creditors.

44.

Plaintiff was required to pay an up-front "initial consultation retainer" to Peak Debt and Fisher in the amount of $3,500.00 prior to any work being performed by Peak Debt and Fisher.

45.

Plaintiff was required by  Peak Debt and Fisher to execute a "Joint Escrow

Agreement" between Plaintiff, Peak Debt and Fisher, which in relevant part stated:

> Fisher Law Group, PLLC (Attorney), Peak Debt Consumption, LLC (Peak) and Vickie Phan (Client), hereby agree to the following terms regarding all Client funds placed in escrow with Peak's then-current designated escrow for future payment of Attorney's and Peak's fees and dispersments [sic] to Client's creditors:
>
> 1. All funds initially placed by Client in escrow shall remain the Client's property until earned/converted and disbursed in accordance with these terms, and according to the parties' separate Debt Consumption Terms and Client Engagement Agreement ("Client Agreement").
>
> 2. Client agrees that Escrow Agent shall honor all directions from Peak's then-current appointed contact person, regarding disbursements to be made to Attorney, Peak, Client's creditors, or other third parties whom Client and Peak agree should receive funds pursuant to the Client Agreement.
>
> 3. Client agrees that it shall deposit into escrow 35% of the total amount presently owed to each creditor that Client wishes to enroll with Attorney and Peak for debt settlement and consumption.
>
> 4. Attorney and Peak will take no action regarding any individual creditor for which Client has not deposited a full 35% of the total claimed by the creditor to be owed to the creditor.

5.  From the 35% of the total debt deposited into escrow,
    Attorney will withdraw 7% of the total owed to be paid
    to Attorney and Peak according to terms of a separate
    agreement between Attorney and Peak.

6.  This will leave 28% of the total debt remaining in
    escrow available for distribution as settlements are
    reached with each creditor.

Joint Escrow Agreement is attached hereto as Exhibit 3.

46.

To this end,  Peak Debt and Fisher persuaded Plaintiff to transfer funds to

them in excess of $34,000.00 by having Plaintiff deposit said funds at various times

beginning in early 2017 and into 2019 directly into  Peak Debt's and Fisher's bank

account.

47.

The funds were deposited directly by Plaintiff into an "escrow" account under

the name of "Deep Creek, LLC" held at a Chase Bank in Salt Lake City, Utah.

48.

As stated in the "Client Engagement Agreement,"  Peak Debt and Fisher also

engaged in credit repair services:

1. . . . Peak is working with Credit Precision - a credit
repair partner - to provide help to the Client in getting their
credit history as accurate as possible. Peak has negotiated
with  Credit  Precision  to  provide  this  service  as  an

additional product offering in connection with Peak's services performed for the Client.

. . .

9. Credit Repair Services. Client acknowledges that Peak's credit repair service provider, Credit Precision, will perform credit repair activities for the Client, and Client hereby authorizes Credit Precision to obtain copies of Client's credit information from Peak or any credit reporting agency as necessary, in order to perform repair activities for the Client. With respect to the credit repair services that Credit Precision will perform for Client, Client hereby authorizes Credit Precision to receive payments from the escrow account by Peak as credit repair services are performed. Details of payment, possible rights of refund, and other credit repair details will be outlined in separate Credit Repair agreement between Client and Credit Precision.

Exhibit 2, ¶¶ 1 and 9.

49.

Plaintiff received and executed the "Credit Repair Services Agreement" with Credit Precision on or about February 26, 2018, wherein it states, "The total amount Peak will disburse on your behalf is $750 - paid from time to time directly from the escrow account as repair services are performed."

50.

The "Credit Repair Services Agreement" is attached hereto as Exhibit 4.

51.

None of the purported credit repair services were performed as promised, yet

Peak Debt and Fisher collected their "credit repair" fees from Plaintiff.

**THE CREDIT REPAIR ORGANIZATIONS ACT, 15 U.S.C. § 1679**

52.

The Credit Repair Organizations Act ("CROA") states as its purpose:

> (1) to ensure that prospective buyers of the services of credit repair organizations are provided with the information necessary to make an informed decision regarding the purchase of such services; and

> (2) to protect the public from unfair or deceptive advertising and business practices by credit repair organizations.

15 U.S.C. § 1679(b).

53.

Plaintiff is a consumer within the definition of CROA. 15 U.S.C. § 1679(a)(1).

54.

Peak Debt and Fisher are "credit repair organizations" within the definition of CROA, as Peak Debt and Fisher are:

> [a] person who uses any instrumentality of interstate commerce or the mails to sell, provide, or perform (or represent that such person can or will sell, provide, or perform) any service, in return for the payment of money

or other valuable consideration, for the express or implied
purpose of—

(i) improving any consumer's credit record, credit
history, or credit rating; or

(ii) providing advice or assistance to any consumer
with regard to any activity or service described in
clause (i)[.]

15 U.S.C. § 1679a(3)(A).

55.

As stated previously,  Peak Debt's and Fisher's self-described activities, if

successful, necessarily result in credit repair, since a settled debt would reduce the

consumer's debt-to-credit ratio (utilization), increase the consumer's credit score,

and would appear on a credit report as paid, partly paid, or settled.

56.

Under CROA, "No person may -- . . . make or use any untrue or misleading

representation  of  the  services  of  the  credit  repair  organization."

15 U.S.C. § 1679b(a)(3).

57.

Further, "No credit repair organization may charge or receive any money or

other valuable consideration for the performance of any service which the credit

repair organization has agreed to perform for any consumer before such service is fully performed."  15 U.S.C. § 1679b(b).

58.

HGI, Peak Debt, and Fisher repeatedly made untrue and misleading representations to Plaintiff by informing her that  Peak Debt and Fisher would settle her debts with her creditors, but instead  HGI, Peak Debt, and Fisher lined their pockets with Plaintiff's money while doing little or nothing to truly assist Plaintiff.

59.

CROA states that:

> Any person who fails to comply with any provision of this title [15 U.S.C. §§ 1679 *et seq.*] with respect to any other person shall be liable to such person in an amount equal to the sum of the amounts determined under each of the following paragraphs:
>
> > (1) Actual damages. The greater of—
> >
> > > (A) the amount of any actual damage sustained by such person as a result of such failure; or
> > >
> > > (B) any amount paid by the person to the credit repair organization.
> >
> > (2) Punitive damages.
> >
> > > (A) Individual actions. In the case of any action by an individual, such additional amount as the court may allow.

15 U.S.C. § 1679g(a).

60.

Further, CROA also invalidates any and all waivers of Plaintiff's rights

pursuant to 15 U.S.C. § 1679f:

> (a) Consumer waivers invalid. Any waiver by any consumer of any protection provided by or any right of the consumer under this title [15 USCS §§ 1679 et seq.]—
>
> (1) shall be treated as void; and
>
> (2) may not be enforced by any Federal or State court or any other person.
>
> (b) Attempt to obtain waiver. Any attempt by any person to obtain a waiver from any consumer of any protection provided by or any right of the consumer under this title [15 USCS §§ 1679 et seq.] shall be treated as a violation of this title [15 USCS §§ 1679 et seq.].
>
> (c) Contracts not in compliance. Any contract for services which does not comply with the applicable provisions of this title [15 USCS §§ 1679 et seq.]—
>
> (1) shall be treated as void; and
>
> (2) may not be enforced by any Federal or State court or any other person.

15 U.S.C. § 1679f.

61.

Thus, Peak Debt's and Fisher's attempts to enforce their class action waivers pursuant to the "Client Engagement Agreement" or their "Credit Repair Services Agreement" are invalid and unenforceable.

## GEORGIA DEBT ADJUSTMENT ACT

62.

The GDAA at OCGA § 18-5-1, defines debt adjusting as:

> [D]oing business in debt adjustments, budget counseling, debt management, or debt pooling service or holding oneself out, by words of similar import, as providing services to debtors in the management of their debts and contracting with a debtor for a fee to:
>
> (A) Effect the adjustment, compromise, or discharge of any account, note or other indebtedness of the debtor;
>
> (B) Receive from the debtor and disburse to his or her creditors any money or other thing of value.

63.

From its initial creation by the Georgia General Assembly in 1956 until its amendment of July 1, 2003, the GDAA stated that "[i]t shall be unlawful for any person to engage in the business of debt adjusting" and that **"[a]ny person who engages in the business of debt adjusting . . . shall be guilty of a misdemeanor**." OCGA § 18-5-2 (1956) (emphasis added).

64.

Thus, the original GDAA undeniably closed and locked the door for persons

to offer debt adjusting for a fee in this state, unless incidental to the practice of law.

65.

In 2003, the General Assembly substantially amended the GDAA. In the

amendment's enabling clause, the legislature stated that the purpose is:

> To limit the maximum charge that may be imposed for the
> provision of debt adjustment services; to provide for
> definitions; to provide for exemptions from those
> provisions related to debt adjustment; to require persons
> engaged in debt adjusting to obtain an annual audit of all
> accounts and to maintain a certain amount and type of
> insurance coverage; to provide for the disbursement of a
> debtor's funds within 30 days of receipt; to require persons
> engaged in debt adjusting to maintain trust accounts for
> debtors' funds; to provide for civil and criminal violations
> and penalties; to provide for investigation and
> enforcement; to provide for related matters; to provide for
> an effective date; to repeal conflicting laws; and for other
> purposes.

2003 Ga. Laws No. 103 p. 392 (House Bill No. 385).

66.

The amended GDAA thus removed the out-and-out prohibition on debt

adjusting for a fee and cracked the door to allow debt adjusters to operate in Georgia

as long as the Act's mandates are followed.

67.

The amended GDAA commands that the debt adjuster "*shall* maintain a separate trust account for the receipt of any and all funds from debtors and the disbursement of such funds on behalf of debtors" (OCGA § 18-5-3.2(b)); "*shall* disburse to the appropriate creditors all funds received from the debtor, less any fees authorized by [the Act], within thirty days of receipt" (OCGA § 18-5-3.2(a)); "*shall* obtain annual audits from independent CPAs on all accounts in which Georgia debtors' funds have been deposited" (OCGA § 18-s-3.1(a)(1)); "*shall* obtain a specified level of insurance coverage for employee dishonesty depositor's forgery and computer fraud" (OCGA § 18-5-3.1(a)(2)); and "*shall not*:

> accept from a debtor who resides in this state, either directly or indirectly, any charge, fee, contribution, or combination thereof in an amount in excess of 7·5 percent of the amount paid monthly by such debtor to such person for distribution to creditors of such debtor . . .

OCGA § 18-5-2 (emphasis added).

68.

The amendment further provided for a civil remedy for a person's violation of the GDAA. OCGA § 18-5-4 states:

> Any person who engages in debt adjusting in violation of the provisions of [OCGA § 18-5-2 or § 18-5-3.2(a)] shall further be liable to the debtor in an amount equal to the total of all fees, charges, or contributions paid by the

debtor plus $5,000.00. Such debtor shall have the right to bring a cause of action directly against such person for violation of the provisions of this chapter.

## VIOLATION OF GEORGIA'S DEBT ADJUSTMENT ACT

69.

HGI is in the business of actively marketing and recruiting clients for Peak Debt's and Fisher's illegal debt adjusting services.

70.

Peak Debt and Fisher are engaged in the business of providing "Debt Adjusting" services as that term is defined in OCGA § 18-5-1.

71.

Peak Debt and Fisher provided Debt Adjusting services to Plaintiff while she resided in the state of Georgia.

72.

Peak Debt and Fisher contracted for and accepted from Plaintiff a charge, fee, contribution, or combination thereof in an amount in excess of 7.5% of the amount they paid monthly for distribution to Plaintiff's creditors.

73.

Peak Debt's and Fisher's conduct is criminal and violates the provisions of the GDAA, and specifically OCGA § 18-5-2.

74.

From February 2017 through 2019,  Peak Debt and Fisher received from Plaintiff moneys for the payment of her creditors which Peak Debt and Fisher retained for more than thirty (30) days.

75.

Peak Debt and Fisher violated OCGA § 18-5-3.2(a) by holding the moneys Plaintiff paid for distribution to Plaintiff's creditors for more than thirty (30) days.

76.

Due to said violations of the GDAA, pursuant to OCGA § 18-5-4(b)(2), Peak Debt and Fisher are liable to Plaintiff in an amount equal to the total of all fees, charges, and/or contributions paid by Plaintiffs to Peak Debt and Fisher, plus statutory damages in the amount of $5,000.00.

**THE GEORGIA FAIR BUSINESS PRACTICES ACT**

77.

The Fair Business Practice Act ("FBPA"), at OCGA § 10-1-391 (a), states:

> The purpose of this part shall be to protect consumers and legitimate business enterprises from unfair or deceptive practices in the conduct of any trade or commerce in part or wholly in the state. It is the intent of the General Assembly that such practices be swiftly stopped, and this part shall be liberally construed and applied to promote its underlying purposes and policies.

78.

The FBPA at OCGA § 10-1-393 states that the following are violations of the

statute:

>(b)  By way of illustration only and without limiting the scope of subsection (a) of this Code section, the following practices are declared unlawful:
>
>. . .
>
>>(5)    Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have;
>
>. . .
>
>>(7)   Representing that goods or services are of a particular standard, quality, or grade or that goods are of a particular style or model, if they are of another;
>
>. . .
>
>>(9)  Advertising goods or services with intent not to sell them as advertised;

79.

The GDAA at OCGA § 18-5-4 states that a violation of the GDAA is also a

violation of the FBPA.

## VIOLATIONS OF THE FBPA

80.

HGI violated the FBPA by "representing that . . . services have . . . characteristics [or] benefits . . . that they do not have", " representing that . . . services are of a particular standard", and/or "advertising . . . services with intent not to sell them as advertised."

81.

HGI intentionally violated the FBPA when it violated the GDAA.

82.

HGI is therefore liable to Plaintiff, for her actual damages, for treble her actual damages for the HGI's intentional violation of the FBPA, and for exemplary damages, plus reasonable attorneys' fees and costs of litigation.

83.

Peak Debt's and Fisher's violations of the GDAA also violated the FBPA.

84.

Peak Debt and Fisher intentionally violated the FBPA when they violated the GDAA.

85.

Peak Debt and Fisher are therefore liable to Plaintiff, in addition to her remedies under the GDAA, for her actual damages, for treble her actual damages for the Peak Debt's and Fisher's intentional violation of the FBPA, and for exemplary damages, plus reasonable attorneys' fees and costs of litigation.

## GEORGIA'S STATE PROCEDURAL PROHIBITION ON CLASS ACTIONS PURSUANT TO THE FBPA IS PRE-EMPTED BY FED. R. CIV. P. 23

86.

The FBPA, at OCGA § 10-1-399(a), states:

> Any person who suffers injury or damages as a result of a violation of Chapter 5B of this title, as a result of consumer acts or practices in violation of this part, as a result of office supply transactions in violation of this part or whose business or property has been injured or damaged as a result of such violations ***may bring an action individually, but not in a representative capacity***, against the person or persons engaged in such violations under the rules of civil procedure to seek equitable injunctive relief and to recover his or her general and exemplary damages sustained as a consequence thereof in any court having jurisdiction over the defendant[.]

Emphasis supplied.

87.

However, as the United States Supreme Court held in *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010):

> [Fed. R Civ. P. 23] says that if the prescribed preconditions are satisfied "[a] class action may be maintained" (emphasis added)--not "a class action may be permitted." Courts do not maintain actions; litigants do. The discretion suggested by Rule 23's "may" is discretion residing in the plaintiff: He may bring his claim in a class action if he wishes. And like the rest of the Federal Rules of Civil Procedure, Rule 23 automatically applies "in all civil actions and proceedings in the United States district courts," Fed. Rule Civ. Proc. 1.

Id. at 400.

> In sum, it is not the substantive or procedural nature or purpose of the affected state law that matters, but the substantive or procedural nature of the Federal Rule. We have held since *Sibbach* [*v. Wilson & Co.*, 312 U.S. 1, 14 (1941)], and reaffirmed repeatedly, that the validity of a Federal Rule depends entirely upon whether it regulates procedure.

Id. at 410.

88.

Further, the Eleventh Circuit held in *Lisk v. Lumber One Wood Preserving, LLC*, 792 F.3d 1331 (11th Cir. 2015):

> This appeal presents two issues. The first arises from a conflict between Federal Rule of Civil Procedure 23, which authorizes class actions including for consumer claims of this kind, and the ADTPA[3], which creates a

---

[3] The Alabama Deceptive Trade Practices Act ("ADTPA") is Alabama's equivalent law to Georgia's Fair Business Practices Act.

private right of action but forbids private class actions. We
hold that Rule 23 controls.

89.

Thus, any prohibition under Georgia's FBPA to the implication of Fed. R.

Civ. P. 23 has been abolished, and this matter may proceed as a class action in federal

court.

## CLASS ALLEGATIONS

90.

Plaintiff seeks to have this Court certify the following classes:

### CLASS 1

All persons who, while residing in the state of Georgia,
received debt settlement or debt adjusting services from
Defendants on or after July 1, 2003 and from whom
Defendants accepted, directly or indirectly, any charge,
fee, contribution, or combination thereof.

### CLASS 2

All persons, while residing in the state of Georgia,
contracted for credit repair services from Defendants,
beginning five (5) years prior to the filing of this
Complaint to the present, and Defendants accepted a fee
for said services before the services were rendered.

91.

On information and belief, the named Plaintiff and the Plaintiff Class

Members were solicited by HGI, Peak Debt, and Fisher through a standard

marketing scheme through which the HGI, Peak Debt, and Fisher offered Debt Adjustment services and credit repair services through Peak Debt's and Fisher's standard scheme. Such marketing and services are typical of those experienced by the Plaintiff and the proposed Plaintiff Class Members.

92.

HGI, Peak Debt, and Fisher commonly targeted Georgia residents for Debt Adjustment services and credit repair services.

93.

On information and belief, the fees collected by Peak Debt and Fisher from the proposed Plaintiff Class Members are uniformly assessed to every customer of Peak Debt and Fisher and can readily be determined from a ministerial review of the records of Peak Debt and Fisher.

94.

On information and belief, the contracts entered into between Peak Debt and Fisher and Plaintiff are standard contracts which are substantially the same as the contracts Peak Debt and Fisher entered into with the Plaintiff Class Members.

95.

The names and addresses of the Plaintiff Class Members can readily be determined from a ministerial review of the records of the Peak Debt and Fisher and

through the account statements of the Peak Debt and Fisher pertaining to collection of such charges, fees, contributions, or combinations thereof.

96.

The membership of the classes is numerous and joinder of individual plaintiffs is impractical. On information and belief, the Peak Debt and Fisher have provided Debt Adjustment services and credit repair services to hundreds of residents of the State of Georgia since July 1, 2003 (in the case of Debt Adjustment services), and hundreds of residents in the past five (5) years (in the case of credit repair services).

97.

There are questions of law and fact common to all members of the Plaintiff classes, and these common questions of law and fact predominate over any individual issues. The principle questions pertinent to the classes as a whole include:

a)  Whether the Peak Debt's and Fisher's standard means of doing business in debt adjustments, debt settlement, debt reduction, budget counseling, and debt management constitutes "Debt Adjustment" under OCGA § 18-5-1;

b)  Whether Peak Debt and Fisher violated OCGA § 18-5-2 by accepting excessive fees from Plaintiff Class Members for the provision of Debt Adjustment services;

c) Whether Peak Debt and Fisher violated OCGA § 18-5-3.2(a) by failing to "disburse to the appropriate creditors all funds received from the debtor . . . within thirty days of receipt";

d) Whether HGI, Peak Debt, and Fisher fraudulently and materially misrepresented their ability to adjust or resolve the debts of the Plaintiff Class Members;

e) Whether Peak Debt and Fisher breached their fiduciary duty by failing to comply with the Georgia Debt Adjustment Act, by misrepresenting the willingness of creditors to resolve class member debt through debt settlement, by misrepresenting the ability of Peak Debt and Fisher to resolve class member debts, by failing to secure agreements with creditors of the class members to resolve their debts, and by performing no service of value for the fees the Peak Debt and Fisher received;

f) Whether the Peak Debt and Fisher violated CROA by misrepresenting that the credit repair services offered were actually being performed;

g) The liability of Peak Debt and Fisher for violations of the Georgia Debt Adjustment Act;

h) The liability of Peak Debt and Fisher for violations of the Credit Repair Organizations Act;

i)   The liability of the HGI, Peak Debt, and Fisher for violations of the Fair Business Practices Act;

j)   The appropriate measure of damages and the appropriate remedies;

k)   Defenses raised by HGI, Peak Debt, and Fisher;

l)   The availability of statutory damages pursuant to OCGA § 18-5-4;

m)  The availability of actual damages pursuant to 15 U.S.C. § 1679g;

n)   The appropriateness of punitive damages pursuant to 15 U.S.C. § 1679g;

o)   The availability of actual damages for HGI's, Peak Debt's, and Fisher's intentional violation of the FBPA pursuant to OCGA § 10-1-399;

p)   The availability of trebled actual damages for HGI's, Peak Debt's, and Fisher's intentional violation of the FBPA pursuant to OCGA § 10-1-399; and

q)   The availability of reasonable attorneys' fees and costs of litigation for HGI's, Peak Debt's, and Fisher's intentional violation of the FBPA pursuant to OCGA § 10-1-399.

98.

The claims of the named Plaintiff are typical of the claims of the Plaintiff Class Members, which all arise from the same operative facts and are based on the

same legal theory, and Plaintiff's claims will thus adequately represent those of the Plaintiff Class Members.

99.

The named Plaintiff will fairly and adequately protect the interests of the Plaintiff Class Members. Plaintiff has retained counsel with experience in class action litigation, and they are not aware of any interest that might cause them not to vigorously pursue this case.

100.

A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder is impracticable. The expense and burden of individual litigation make it virtually impossible for the members of the class to proceed individually, and it is therefore most efficient to resolve all claims based on HGI's, Peak Debt's, and Fisher's conduct in one forum.

101.

The Plaintiff is aware of no difficulties that will be encountered in the management of this litigation that would render the action unmanageable. This is not a class action that will require an analysis of HGI's, Peak Debt's, and Fisher's conduct as to individual class members.

102.

Prosecution of separate actions by individual Plaintiff Class Members would create adjudications that would be dispositive of the interests of the other members not parties to the adjudication. Plaintiff is not aware of any other pending actions against these Defendants for these same causes of action.

103.

Without a class action mechanism, members of the Plaintiff Class would be substantially impaired or impeded in their ability to protect their interests. The value of claims of the individual class members would be in an amount that makes prosecution outside of the class action uneconomical.

104.

A final judgment on the merits of the named Plaintiff's claims would be fully dispositive of the claims and interests of those similarly situated who are not specifically named as a plaintiff in this action.

**WHEREFORE**, Plaintiff being entitled to a trial by jury and judgment against HGI, Peak Debt, and Fisher, prays for the following:

a)  That summons be directed to HGI, Peak Debt, and Fisher and served upon it as provided by law;

b) That Plaintiff be designated class representatives for Class I and Class II as defined herein;

c) That Plaintiff's counsel be designated class counsel for Class I and Class II as defined herein;

d) That the Class I be certified for all persons who, while residing in the state of Georgia, received debt settlement or debt adjusting services from Peak Debt and Fisher on or after July 1, 2003 and from whom Peak Debt and Fisher accepted, directly or indirectly, any charge, fee, contribution, or combination thereof;

e) That the Class II certified for all persons, while residing in the state of Georgia, contracted for credit repair services from Peak Debt and Fisher, beginning five (5) years prior to the filing of this Complaint to the present, and Peak Debt and Fisher accepted a fee for said services before the services were rendered;

f) That the Court hold a hearing as soon as practicable for the determination of class certification for Class I and Class II in accordance with Fed. R. Civ. P. 23;

g) For each violation of OCGA §§ 18-5-1 *et seq.* by Peak Debt and Fisher, that the Plaintiffs and the members of Class I be awarded an amount equal

to all charges, fees, contributions, or combinations therefore paid to Peak
Debt and Fisher plus $5,000.00 as allowed under OCGA §§ 18-5-1 *et seq.*;

h) For violations of the FBPA, that Plaintiff and the members of Class I be
awarded their actual damages, trebled damages, exemplary damages, and
reasonable attorney's fees and costs;

i) For each violation of the 15 U.S.C. § 1679 committed by Peak Debt and
Fisher, that the Plaintiff and the members of Class II be awarded an amount
equal to their actual damages, punitive damages in an amount that the
Court may allow, and attorneys' fees and costs of the action;

j) That Defendants be required to pay all monies herein referred to in
subparagraph g) and h) into a common fund for the benefit of Class I, less
expenses and attorneys' fees;

k) That Defendants be required to pay all monies herein referred to in
subparagraph i) into a common fund for the benefit of Class II, less
expenses and attorneys' fees;

l) That the Court conduct a "fairness hearing," after due and proper notice to
all members of Class I and Class II, and make such award of attorneys'
fees and expenses as the Court deems appropriate from the common funds
(as above referred to) and/or from Defendants;

m) That Plaintiff, individually and as class representative for Class I and Class II, have a trial by jury;

n) That Plaintiff and the members of Class I and Class II be awarded interest on any award granted, with such interest accruing from the time of the filing of this Complaint until the time final Judgment in this case is paid;

o) That Plaintiff be awarded an incentive award from Defendants for the benefit the named Plaintiff has conferred on the Class I and Class II members through her commitment of time and expense in conducting this lawsuit; and

p) That Plaintiff, individually and as class representatives of all others similarly situated as Class I and Class II, have such other relief as this Court deems proper.

Respectfully submitted, this 30th day of January, 2020.

**HURT STOLZ, P.C.**


/s/  James W. Hurt, Jr.
By:  James W. Hurt, Jr.
Georgia Bar No.:  380104

1551 Jennings Mill Road, Suite 3100-B
Watkinsville, Georgia 30677
(706) 395-2750
Facsimile: (866) 766-9245
jhurt@hurtstolz.com                              **ATTORNEY FOR PLAINTIFF**

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local R. 7.1(D), this is to certify that the foregoing complies with the font and point setting approved by the Court in LR 5.1(B). The foregoing FIRST AMENDED COMPLAINT FOR DAMAGES IN CLASS ACTION was prepared on a computer, using Times New Roman 14 point font.

Respectfully submitted, this 30th day of January, 2020.

**HURT STOLZ, P.C.**

/s/  James W. Hurt, Jr.
By:  James W. Hurt, Jr.
Georgia Bar No.:  380104

1551 Jennings Mill Road, Suite 3100-B
Watkinsville, Georgia 30677
(706) 395-2750
Facsimile: (866) 766-9245
jhurt@hurtstolz.com                              **ATTORNEY FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that I have filed the PLAINTIFF'S AMENDED COMPLAINT with the Clerk of Court via the CM/ECF system, which will automatically provide all counsel of record with email notification of this filing.

Andrew M. Stevens
astevens@lawstevens.com

Robert A. Luskin
rluskin@gm-llp.com

Scott Robert Hoopes
scott@millshoopeslaw.com

Respectfully submitted, this 30th day of January, 2020.

**HURT STOLZ, P.C.**

/s/  James W. Hurt, Jr.
By:  James W. Hurt, Jr.
Georgia Bar No.:  380104

1551 Jennings Mill Road, Suite 3100-B
Watkinsville, Georgia 30677
(706) 395-2750
Facsimile:  (866) 766-9245
jhurt@hurtstolz.com                    **ATTORNEY FOR PLAINTIFF**