IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

| | | |
|---|---|---|
| VICKIE PHAN, and<br> KAY KALANTARI,<br>individually and on behalf of all<br>others similarly situated,<br><br>　　　Plaintiffs,<br><br>v.<br><br>PEAK DEBT CONSUMPTION,<br>LLC<br>CHRIS MCCORMICK,<br>FISHER LAW GROUP, PLLC, and<br>DAVID FISHER,<br><br>　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CIVIL ACTION NUMBER:<br>1:19-cv-04613-JPB<br><br><br><br><br>COMPLAINT – CLASS ACTION<br><br>JURY TRIAL DEMANDED |

## **[PROPOSED] SECOND AMENDED COMPLAINT IN CLASS ACTION FOR DAMAGES**

COME NOW, Plaintiffs Vickie Phan and Dr. Kay Kalantari, individually and on behalf of all others similarly situated, and file this, their Second Amended Complaint in Class Action for Damages pursuant to the Credit Repair Organizations Act, ("CROA"), 15 U.S.C. § 1679, the Georgia Debt Adjustment Act, OCGA § 18-5-1 *et seq*., and the Georgia Fair Business Practices Act, OCGA § 10-1-390 *et seq*., against Peak Debt Consumption, LLC, Chris McCormick

(collectively "Peak Debt"), Fisher Law Group, PLLC, and David Fisher, (collectively "Fisher") and show this Honorable Court the following:

## **INTRODUCTION**

The Defendants are in the business of ripping off vulnerable people. Defendants took advantage of this Plaintiffs who got behind on their bills and reached out for help from Defendants who fraudulently represented that Defendants could settle Plaintiffs' debt for a fraction of what was owed, and then lined their pockets with Plaintiffs' money rather than assisting them. What Defendants have done is criminal and reprehensible. Defendants should be forced to compensate Plaintiffs and be punished so that they cease their illegal scheme.

1.

Defendants are a collection of interrelated entities, limited liability companies, corporations, partnerships, and/or individuals or a joint enterprise and/or venture that collectively comprise a debt adjustment[1] marketing and

---

[1] OCGA § 18-5-1(1) defines debt adjusting as follows:

> Debt adjusting means doing business in debt adjustments, budget counseling, debt management, or debt pooling service or holding oneself out, by words of similar import, as providing services to debtors in the management of their debts and contracting with a debtor for a fee to:

services operation targeting financially troubled consumers and extracting from

individuals least able to afford it exorbitant fees for worthless services.

2.

Plaintiffs pursue this action under the Credit Repair Organizations Act,

15 U.S.C. § 1679 *et. seq.* (hereinafter "CROA").

3.

CROA states as its purpose:

> (1) to ensure that prospective buyers of the services of credit repair organizations are provided with the information necessary to make an informed decision regarding the purchase of such services; and

> (2) to protect the public from unfair or deceptive advertising and business practices by credit repair organizations.

15 U.S.C. § 1679(b).

4.

Plaintiffs also pursue this action under the Georgia Debt Adjustment Act,

OCGA §§ 18-5-1 *et seq*., (hereinafter "GDAA").

---

> (A) Effect the adjustment, compromise, or discharge of any account, note, or other indebtedness of the debtor; or

> (B) Receive from the debtor and disburse to his or her creditors any money or other thing of value.

5.

The Georgia General Assembly allows debt adjusting as long as it meets the consumer protection criteria set forth in the GDAA. The debt adjuster is allowed to receive funds from the debtor and then in turn distribute payment to the debtor's individual creditors in accordance with a pre-determined agreement with each creditor. In addition, the debt adjuster is allowed to withhold limited fees, not more than 7.5%, for itself under the GDAA.

6.

The GDAA makes clear that the fee charged by a debt adjuster for debt adjustment services is capped at 7.5% of the amount distributed monthly to the debtor's creditors (see OCGA § 18-5-2); and that all funds received from a Georgia debtor must be disbursed to the appropriate creditors, less any fees authorized by the GDAA, within 30 days of receipt of such funds (see OCGA § 18-5-3.2(a)); the GDAA declares that a violation of any of these provisions is a misdemeanor. See OCGA § 18-5-4(a).

7.

Thus, the debt settlement services marketed by HGI and provided by Peak Debt and Fisher to Plaintiffs are in direct violation of Georgia law and in no way comport with the GDAA.

8.

Peak Debt Consumption states in its <u>"Peak Credit File Mastery Agreement"</u>:

> THIS PROGRAM IS DESIGNED TO REMOVE
> DEROGATORY ITEMS FROM CREDIT REPORTS –
> IT WILL NOT REMOVE YOUR OBLIGATION TO
> PAY THE UNDERLYING DEBT. YOUR CREDIT
> SCORE MAY OR MAY NOT GO UP ONCE THE
> PROCESS IS COMPLETED, DEPENDING ON HOW
> MUCH POSITIVE CREDIT YOU STILL HAVE ON
> YOUR FILE ONCE IT HAS BEEN CLEANED.

<u>See "Peak Credit File Mastery Agreement" attached hereto as Exhibit 1.</u>

9.

Peak Debt's self-described activities, if successful, necessarily result in credit repair, since a settled debt would reduce the consumer's debt-to-credit ratio (utilization), increase the consumer's credit score, and would appear on a credit report as paid, partly paid, or settled.

10.

Under CROA, "No person may -- . . . make or use any untrue or misleading representation of the services of the credit repair organization." <u>15 U.S.C. § 1679b(a)(3)</u>.

11.

Further, "No credit repair organization may charge or receive any money or other valuable consideration for the performance of any service which the credit

repair organization has agreed to perform for any consumer before such service is fully performed." 15 U.S.C. § 1679b(b).

12.

Peak Debt and Fisher repeatedly made untrue and misleading representations to Plaintiffs by informing them that Peak Debt and Fisher would it would settle her debts with their creditors, but instead Peak Debt and Fisher lined their pockets with Plaintiffs' money while doing little or nothing to truly assist Plaintiffs.

13.

CROA states that:

> Any person who fails to comply with any provision of this title [15 U.S.C. §§ 1679 *et seq*.] with respect to any other person shall be liable to such person in an amount equal to the sum of the amounts determined under each of the following paragraphs:
>
> (1) Actual damages. The greater of—
>
>> (A) the amount of any actual damage sustained by such person as a result of such failure; or
>>
>> (B) any amount paid by the person to the credit repair organization.
>
> (2) Punitive damages.
>
>> (A) Individual actions. In the case of any action by an individual, such additional amount as the court may allow.

(B) Class actions. In the case of a class action, the sum of—

    (i) the aggregate of the amount which the court may allow for each named plaintiff; and

    (ii) the aggregate of the amount which the court may allow for each other class member, without regard to any minimum individual recovery.

(3) Attorneys' fees. In the case of any successful action to enforce any liability under paragraph (1) or (2), the costs of the action, together with reasonable attorneys' fees.

15 U.S.C. § 1679g(a).

14.

Plaintiffs also pursue this action under the Fair Business Practices Act, OCGA §§ 10-1-390 *et seq.*, (hereinafter "FBPA") which authorizes, in addition to all other remedies, recovery of actual damages, plus exemplary damages and, in the case of intentional violations of the FBPA, treble damages; personal liability of responsible corporate officers when a corporate defendant fails to pay a judgment within thirty days, and reasonable attorneys' fees and costs of litigation, because the GDAA provides that a violation of the GDAA is also a violation of the FBPA.[2]

---

[2] See OCGA § 18-5-4(d).

15.

Peak Debt and Fisher promotes themselves in print, *via* the internet, and through public media as debt adjustment and settlement organizations that can negotiate a settlement of a client's unsecured debt for less than the amount owed and/or provides other debt solutions.

16.

After being directed by HGI to Peak Debt and Fisher, Peak Debt and Fisher collect the potential client's financial information, including account numbers for all unsecured debts. Once Peak Debt and Fisher have this information, they persuade the client that through their many years of experience, their connections in the credit industry, and their financial savvy, Peak Debt and Fisher can dramatically lower the client's debts and get the client out of debt quickly.

17.

 Peak Debt and Fisher exacerbated Plaintiffs' already dire straits by advising them to cease payments to their creditors. Peak Debt and Fisher placed themselves in a superior position to receive all of their fees from Plaintiffs before any action would be taken on their behalf. Further, Peak Debt and Fisher's advice and persuasion placed Plaintiffs in the cross-hairs of multiple debt collection lawsuits.

18.

Thus, the debt settlement services Peak Debt and Fisher provided to Plaintiffs are in direct violation of Georgia law, in no way comport with the GDAA, and violate the FBPA (see OCGA § 18-5-4(d)).

## PARTIES, JURISDICTION AND VENUE

19.

Plaintiff Vickie Phan is a domiciliary of the State of Georgia and of Gwinnett County.

22.

Plaintiff Kay Kalantari is a domiciliary of the State of Georgia and of Cobb County.

23.

Defendant Peak Debt is a Utah limited liability company with its principal place of business at 690 Highway 89, Suite 200, Jackson, Wyoming 83002.

24.

Peak Debt maintains its registered office at 1891 East Frontier Road, Salt Lake City, Utah, 84121-1321 and names as its registered agent, Chris E. McCormick. Peak Debt has been served with Summons and a copy of this Complaint at this address.

25.

Defendant Chris E. McCormick ("McCormick") is a domiciliary of the State of Utah and has been served with Summons and a copy of this Complaint at 1891 East Frontier Road, Salt Lake City, Utah, 84121-1321.

26.

McCormick is the principal, owner or president of Peak Debt and is responsible Peak Debt's daily operations.

27.

Non-party Credit Precision, Inc. ("Credit Precision") is a Georgia corporation duly registered with the Georgia Secretary of State with its principal place of business at 280 Interstate North Circle SE, Suite 500, Atlanta, GA, 30339.

28.

Non-party Credit Precision maintained its registered office at 280 Interstate North Circle SE, Suite 500, Atlanta, GA, 30339 and named as its registered agent, Mark Miller. Credit Precision has been served with Summons and a copy of this Complaint at this address.

29.

Non-party Credit Precision was recruited by Peak Debt to perform Credit Repair services on behalf of Peak Debt's clients, and Peak Debt charged credit

repair fees to its clients, prior to any credit repair being performed, under the guise that Credit Precision had undertaken the work.

30.

Defendant Fisher Law Group, PLLC ("Fisher Law") is a Utah professional limited liability company that maintains its principal place of business at 2825 East Cottonwood Parkway, Suite 500, Cottonwood Heights, Utah 84121.

31.

Fisher Law maintains its registered office at 2825 East Cottonwood Parkway, Suite 500, Cottonwood Heights, Utah 84121 and names David Fisher as its registered agent. Fisher Law has been served with Summons and a copy of this Complaint at this address.

32.

Defendant David Fisher in a Utah licensed attorney residing at 1328 Mountain Orchard Drive, Pleasant View, Utah, 84414 and has been served with Summons and a copy of this Complaint at this address.

33.

At all times relevant to this Complaint, David Fisher and Fisher Law were acting as agents, principals, or employees of Defendant Peak Debt and worked in conjunction with Peak Debt in providing debt adjustment services.

34.

Non-party Hegemon Group International, LLC ("HGI") is a Georgia limited liability company duly registered with the Georgia Secretary of State and maintains it principal office at P.O. Box 2985 Suwanee, Georgia 30024.

35.

HGI maintains its registered office at 400 Galleria Parkway, Suite 1500, Atlanta, Georgia 30339 and names as its registered agent, J.F. Tenney Law, LLC. Hegemon has been served with Summons and a copy of this Complaint at this address.

36.

At all times relevant to this Complaint, non-party HGI was acting as an agent, a principal, or employee of Defendant Peak Debt and worked in conjunction with Peak Debt to actively market Peak Debt's and Fisher's debt adjustment services to debtors, including Plaintiffs.

37.

To this day, one of HGI's Facebook pages continues to actively promote Defendant Peak Debt by stating "Tired of those unsecured debt? There's a way out. Message me for details." This HGI Facebook page can be found at: https://www.facebook.com/tongyang.hgi/videos/400484130398620/.

38.

The Court has jurisdiction pursuant to 15 U.S.C. § 1679g; 28 U.S.C. § 1331, and § 1367.

39.

Venue is appropriate in the Northern District of Georgia because the Plaintiffs reside within the judicial district, a substantial part of the events giving rise to the claim occurred within the district, and all of the named Defendants transact business here.

## RELEVANT FACTS AS TO VICKIE PHAN

40.

Prior to February 2018, Plaintiff Vickie Phan underwent financial difficulties from an excess of $104,270.49 in unsecured consumer debt owed to ten (10) different creditors.

41.

Due to the interest rates charged by her unsecured creditors and the large amount owed on these accounts, Plaintiff Vickie Phan experienced difficulties in paying her monthly financial obligations.

42.

Plaintiff Vickie Phan met Ty Phoummithone, a regional marketing director for Defendant HGI, who introduced Plaintiff Vickie Phan to  Defendants Peak Debt and Fisher, and persuaded Plaintiff Vickie Phan to engage Defendant Peak Debt and Fisher for debt settlement and credit repair services.

43.

On or about February 26, 2017, Plaintiff Vickie Phan engaged Peak Debt and Fisher to perform debt settlement services and credit repair services on her behalf with her creditors.

44.

A true and accurate copy of the "Client Engagement Agreement" is attached hereto as Exhibit 2.

45.

 Peak Debt and Fisher explained to Plaintiff that they could assist her if she signed up with them for their "debt settlement" program, which consisted of Plaintiff providing all unsecured credit account information and balances, agreeing to not have any further contact with any of her creditors, and to begin paying various sums to Peak Debt and Fisher, in amounts determined by Peak Debt and Fisher, to settle Plaintiff Vickie Phan's debts.

46.

Peak Debt and Fisher divided Plaintiff Vickie Phan's debts in "sets" which Peak Debt and Fisher claimed to be settling in "batches" based on Plaintiff Vickie Phan's ability to pay a minimum of thirty-five percent (35%) of the total amount owed to any particular "batch" of creditors.

47.

Plaintiff Vickie Phan was required to pay an up-front "initial consultation retainer" to Peak Debt and Fisher in the amount of $3,500.00 prior to any work being performed by Peak Debt and Fisher.

48.

Plaintiff Vickie Phan was required by Peak Debt and Fisher to execute a "Joint Escrow Agreement" between Plaintiff Vickie Phan, Peak Debt and Fisher, which in relevant part stated:

> Fisher Law Group, PLLC (Attorney), Peak Debt Consumption, LLC (Peak) and Vickie Phan (Client), hereby agree to the following terms regarding all Client funds placed in escrow with Peak's then-current designated escrow for future payment of Attorney's and Peak's fees and dispersments [sic] to Client's creditors:
>
> 1. All funds initially placed by Client in escrow shall remain the Client's property until earned/converted and disbursed in accordance with these terms, and according to the parties' separate Debt Consumption

Terms and Client Engagement Agreement ("Client Agreement").

2. Client agrees that Escrow Agent shall honor all directions from Peak's then-current appointed contact person, regarding disbursements to be made to Attorney, Peak, Client's creditors, or other third parties whom Client and Peak agree should receive funds pursuant to the Client Agreement.

3. Client agrees that it shall deposit into escrow 35% of the total amount presently owed to each creditor that Client wishes to enroll with Attorney and Peak for debt settlement and consumption.

4. Attorney and Peak will take no action regarding any individual creditor for which Client has not deposited a full 35% of the total claimed by the creditor to be owed to the creditor.

5. From the 35% of the total debt deposited into escrow, Attorney will withdraw 7% of the total owed to be paid to Attorney and Peak according to terms of a separate agreement between Attorney and Peak.

6. This will leave 28% of the total debt remaining in escrow available for distribution as settlements are reached with each creditor.

Joint Escrow Agreement is attached hereto as Exhibit 3.

49.

To this end, Peak Debt and Fisher persuaded Plaintiff Vickie Phan to transfer funds to them in excess of $34,000.00 by having Plaintiff Vickie Phan

deposit said funds at various times beginning in early 2017 and into 2019 directly into Peak Debt's and Fisher's bank account.

50.

The funds were deposited directly by Plaintiff Vickie Phan into an "escrow" account under the name of "Deep Creek, LLC" held at a Chase Bank in Salt Lake City, Utah.

51.

As stated in the "Client Engagement Agreement," Peak Debt and Fisher also engaged in credit repair services:

> 1. . . . Peak is working with Credit Precision - a credit repair partner - to provide help to the Client in getting their credit history as accurate as possible. Peak has negotiated with Credit Precision to provide this service as an additional product offering in connection with Peak's services performed for the Client.
>
> . . .
>
> 9. Credit Repair Services. Client acknowledges that Peak's credit repair service provider, Credit Precision, will perform credit repair activities for the Client, and Client hereby authorizes Credit Precision to obtain copies of Client's credit information from Peak or any credit reporting agency as necessary, in order to perform repair activities for the  Client. With respect to the credit repair services that Credit Precision will perform for Client, Client hereby authorizes Credit Precision to receive payments from the escrow account by Peak as credit repair services are performed. Details of payment,

possible rights of refund, and other credit repair details will be outlined in separate Credit Repair agreement between Client and Credit Precision.

Exhibit 2, ¶¶ 1 and 9.

52.

Plaintiff Vickie Phan received and executed the "Credit Repair Services Agreement" with Credit Precision on or about February 26, 2018, wherein it states, "The total amount Peak will disburse on your behalf is $750 - paid from time to time directly from the escrow account as repair services are performed."

53.

The "Credit Repair Services Agreement" is attached hereto as Exhibit 4.

54.

None of the purported credit repair services were performed as promised, yet Peak Debt and Fisher collected their "credit repair" fees from Plaintiff Vickie Phan.

## RELEVANT FACTS AS TO DR. KAY KALANTARI

55.

Prior to April 2017, Plaintiff Dr. Kyandukhta "Kay" Kalantari ("Kalantari") underwent financial difficulties from an excess of $208,000.00 in unsecured consumer debt owed to at least 6 different creditors.

56.

Due to the interest rates charged by her unsecured creditors and the large amount owed on these accounts, Plaintiff Kalantari experienced difficulties in paying her monthly financial obligations.

57.

Plaintiff Kalantari became aware of Peak Debt Consumption, LLC (then known as "Teton Debt Settlement Corporation" hereinafter "Teton") through Sherry Unwala, an employee of Defendant Hegemon Group International, LLC when Unwala introduced Kalantari to Peak Debt and Fisher.

20.

A true and accurate copy of the "Client Engagement Agreement" is attached hereto as Exhibit 5.

21.

Peak Debt and Fisher explained to Plaintiff Kalantari that they could assist her if she signed up with them for their "debt settlement" program, which consisted of Plaintiff Kalantari providing all unsecured credit account information and balances, agreeing to not have any further contact with any of her creditors, and to begin paying various sums to Peak Debt and Fisher, in amounts determined by Peak Debt and Fisher, to settle Plaintiff Kalantari's debts.

22.

In April 2017, Plaintiff Kalantari engaged Peak Debt and Fisher to perform debt settlement services and credit repair services on her behalf with her creditors.

23.

Peak Debt and Fisher divided Plaintiff Kalantari's debts in "sets" which Peak Debt and Fisher claimed to be settling in "batches" based on Plaintiff Kalantari's ability to pay a minimum of thirty-five percent (35%) of the total amount owed to any particular "batch" of creditors.

24.

Plaintiff Kalantari was required to pay an up-front "initial consultation retainer" to Peak Debt and Fisher in the amount of $135,000.00 prior to any work being performed by Peak Debt and Fisher.

25.

Upon information and belief, Plaintiff Kalantari was required by Peak Debt and Fisher to execute a "Joint Escrow Agreement" between Plaintiff Kalantari, Peak Debt and Fisher, which in relevant part stated:

> Fisher Law Group, PLLC (Attorney), Peak Debt Consumption, LLC (Peak) and Dr. Kyandukhta "Kay" Kalantari (Client), hereby agree to the following terms regarding all Client funds placed in escrow with Peak's then-current designated escrow for future payment of

Attorney's and Peak's fees and dispersments [sic] to Client's creditors:

7. All funds initially placed by Client in escrow shall remain the Client's property until earned/converted and disbursed in accordance with these terms, and according to the parties' separate Debt Consumption Terms and Client Engagement Agreement ("Client Agreement").

8. Client agrees that Escrow Agent shall honor all directions from Peak's then-current appointed contact person, regarding disbursements to be made to Attorney, Peak, Client's creditors, or other third parties whom Client and Peak agree should receive funds pursuant to the Client Agreement.

9. Client agrees that it shall deposit into escrow 35% of the total amount presently owed to each creditor that Client wishes to enroll with Attorney and Peak for debt settlement and consumption.

10. Attorney and Peak will take no action regarding any individual creditor for which Client has not deposited a full 35% of the total claimed by the creditor to be owed to the creditor.

11. From the 35% of the total debt deposited into escrow, Attorney will withdraw 7% of the total owed to be paid to Attorney and Peak according to terms of a separate agreement between Attorney and Peak.

12. This will leave 28% of the total debt remaining in escrow available for distribution as settlements are reached with each creditor.

26.

To this end, Peak Debt and Fisher persuaded Plaintiff Kalantari to transfer funds to them in excess of $187,500.00 by having Plaintiff Kalantari deposit said funds at various times beginning in 2017 and into 2018 directly into Peak Debt's and Fisher's bank account.

27.

The funds were deposited directly by Plaintiff Kalantari into an "escrow" account under the name of "Deep Creek, LLC" held at a Chase Bank in Salt Lake City, Utah.

28.

As stated in the "Client Engagement Agreement," Peak Debt (f/k/a Teton) and Fisher also engaged in credit repair services:

1. **Purpose**. Teton is a debt management and debt consumption company; Client desires to engage Teton to perform various debt-related services, including, but not limited to, the attempted negotiation of Client's various debts to obtain more favorable terms, the facilitation of payments to creditors under the new terms, and ***transfer of debt reporting by creditors to credit bureaus from Client to Teton, credit repair, credit building, and related services (collectively "Services").***

Exhibit 5, ¶ 1.

29.

Further, Plaintiff Kalantari executed a "Power of Attorney" in favor of Peak

Debt f/k/a Teton which states:

> 1.To demand, sue for, recover, collect, and receive any and all money, debts, accounts, legacies, bequests, interests, dividends, annuities, and demands whatsoever as are now or shall hereafter become due, owing, payable, or belonging to or claimed by me.
>
> 2. To use all lawful means necessary for the recovery thereof, by legal process or otherwise.
>
> 3. To compromise, release, subordinate, satisfy and discharge the same.
>
> 4. To consume and/or settle all debts, accounts, and funds as listed in this document.
>
> 5. To receive all my rights to have these accounts benefit or be detrimental to my credit accounts.
>
> 6. To receive, pull, request, and gather information from my credit report, and to any or all open or closing of these listed accounts.
>
> Consumption or transfer of my rights to all lawsuits, or any other needed action, will be performed by, and the responsibility of, the power of my Agent.

Exhibit 6, attached hereto.

30.

None of the purported credit repair services were performed as promised, yet Peak Debt and Fisher collected their "credit repair" fees from Plaintiff Kalantari.

## THE CREDIT REPAIR ORGANIZATIONS ACT, 15 U.S.C. § 1679

70.

The Credit Repair Organizations Act ("CROA") states as its purpose:

> (1) to ensure that prospective buyers of the services of credit repair organizations are provided with the information necessary to make an informed decision regarding the purchase of such services; and

> (2) to protect the public from unfair or deceptive advertising and business practices by credit repair organizations.

15 U.S.C. § 1679(b).

71.

Plaintiff Vickie Phan is a consumer within the definition of CROA. 15 U.S.C. § 1679(a)(1).

72.

Plaintiff Kay Kalantari is a consumer within the definition of CROA. 15 U.S.C. § 1679(a)(1).

31.

Peak Debt and Fisher are "credit repair organizations" within the definition of CROA, as Peak Debt and Fisher are:

> [a] person who uses any instrumentality of interstate commerce or the mails to sell, provide, or perform (or represent that such person can or will sell, provide, or perform) any service, in return for the payment of money or other valuable consideration, for the express or implied purpose of—
>
> > (i) improving any consumer's credit record, credit history, or credit rating; or
> >
> > (ii) providing advice or assistance to any consumer with regard to any activity or service described in clause (i)[.]

15 U.S.C. § 1679a(3)(A).

32.

As stated previously, Peak Debt's and Fisher's self-described activities, if successful, necessarily result in credit repair, since a settled debt would reduce the consumer's debt-to-credit ratio (utilization), increase the consumer's credit score, and would appear on a credit report as paid, partly paid, or settled.

33.

Under CROA, "No person may -- . . . make or use any untrue or misleading representation of the services of the credit repair organization." 15 U.S.C. § 1679b(a)(3).

34.

Further, "No credit repair organization may charge or receive any money or other valuable consideration for the performance of any service which the credit repair organization has agreed to perform for any consumer before such service is fully performed." 15 U.S.C. § 1679b(b).

35.

HGI, Peak Debt, and Fisher repeatedly made untrue and misleading representations to Plaintiffs by informing them that Peak Debt and Fisher would settle their debts with their creditors, but instead Peak Debt and Fisher lined their pockets with Plaintiffs' money while doing little or nothing to truly assist Plaintiffs.

36.

CROA states that:

> Any person who fails to comply with any provision of this title [15 U.S.C. §§ 1679 *et seq.*] with respect to any other person shall be liable to such person in an amount

equal to the sum of the amounts determined under each of the following paragraphs:

> (1) Actual damages. The greater of—

>> (A) the amount of any actual damage sustained by such person as a result of such failure; or

>> (B) any amount paid by the person to the credit repair organization.

> (2) Punitive damages.

>> (A) Individual actions. In the case of any action by an individual, such additional amount as the court may allow.

15 U.S.C. § 1679g(a).

37.

Further, CROA also invalidates any and all waivers of Plaintiffs' rights

pursuant to 15 U.S.C. § 1679f:

> (a) Consumer waivers invalid. Any waiver by any consumer of any protection provided by or any right of the consumer under this title [15 USCS §§ 1679 et seq.]—

> (1) shall be treated as void; and

> (2) may not be enforced by any Federal or State court or any other person.

> (b) Attempt to obtain waiver. Any attempt by any person to obtain a waiver from any consumer of any protection provided by or any right of the consumer under this title

[15 USCS §§ 1679 et seq.] shall be treated as a violation of this title [15 USCS §§ 1679 et seq.].

(c) Contracts not in compliance. Any contract for services which does not comply with the applicable provisions of this title [15 USCS §§ 1679 et seq.]—

(1) shall be treated as void; and

(2) may not be enforced by any Federal or State court or any other person.

15 U.S.C. § 1679f.

38.

Thus, Peak Debt's and Fisher's attempts to enforce their class action waivers pursuant to the "Client Engagement Agreement" or their "Credit Repair Services Agreement" are invalid and unenforceable.

<strong><u>GEORGIA DEBT ADJUSTMENT ACT</u></strong>

39.

The GDAA at OCGA § 18-5-1, defines debt adjusting as:

[D]oing business in debt adjustments, budget counseling, debt management, or debt pooling service or holding oneself out, by words of similar import, as providing services to debtors in the management of their debts and contracting with a debtor for a fee to:

(A) Effect the adjustment, compromise, or discharge of any account, note or other indebtedness of the debtor;

(B) Receive from the debtor and disburse to his or her creditors any money or other thing of value.

40.

From its initial creation by the Georgia General Assembly in 1956 until its amendment of July 1, 2003, the GDAA stated that "[i]t shall be unlawful for any person to engage in the business of debt adjusting" and that **"[a]ny person who engages in the business of debt adjusting ... shall be guilty of a misdemeanor**." OCGA § 18-5-2 (1956) (emphasis added).

41.

Thus, the original GDAA undeniably closed and locked the door for persons to offer debt adjusting for a fee in this state, unless incidental to the practice of law.

42.

In 2003, the General Assembly substantially amended the GDAA. In the amendment's enabling clause, the legislature stated that the purpose is:

> To limit the maximum charge that may be imposed for the provision of debt adjustment services; to provide for definitions; to provide for exemptions from those provisions related to debt adjustment; to require persons engaged in debt adjusting to obtain an annual audit of all accounts and to maintain a certain amount and type of insurance coverage; to provide for the disbursement of a debtor's funds within 30 days of receipt; to require persons engaged in debt adjusting to maintain trust accounts for debtors' funds; to provide for civil and criminal violations and penalties; to provide for investigation and enforcement; to provide for related matters; to provide for an effective date; to repeal conflicting laws; and for other purposes.

2003 Ga. Laws No. 103 p. 392 (House Bill No. 385).

43.

The amended GDAA thus removed the out-and-out prohibition on debt adjusting for a fee and cracked the door to allow debt adjusters to operate in Georgia as long as the Act's mandates are followed.

44.

The amended GDAA commands that the debt adjuster "*shall* maintain a separate trust account for the receipt of any and all funds from debtors and the disbursement of such funds on behalf of debtors" (OCGA § 18-5-3.2(b)); "*shall* disburse to the appropriate creditors all funds received from the debtor, less any fees authorized by [the Act], within thirty days of receipt" (OCGA § 18-5-3.2(a)); "*shall* obtain annual audits from independent CPAs on all accounts in which Georgia debtors' funds have been deposited" (OCGA § 18-s-3.1(a)(1)); "*shall* obtain a specified level of insurance coverage for employee dishonesty depositor's forgery and computer fraud" (OCGA § 18-5-3.1(a)(2)); and "*shall not*:

> accept from a debtor who resides in this state, either directly or indirectly, any charge, fee, contribution, or combination thereof in an amount in excess of 7·5 percent of the amount paid monthly by such debtor to such person for distribution to creditors of such debtor . . .

OCGA § 18-5-2 (emphasis added).

45.

The amendment further provided for a civil remedy for a person's violation

of the GDAA. OCGA § 18-5-4 states:

> Any person who engages in debt adjusting in violation of
> the provisions of [OCGA § 18-5-2 or § 18-5-3.2(a)] shall
> further be liable to the debtor in an amount equal to the
> total of all fees, charges, or contributions paid by the
> debtor plus $5,000.00. Such debtor shall have the right to
> bring a cause of action directly against such person for
> violation of the provisions of this chapter.

## VIOLATION OF GEORGIA'S DEBT ADJUSTMENT ACT

46.

HGI is in the business of actively marketing and recruiting clients for Peak

Debt's and Fisher's illegal debt adjusting services.

47.

Peak Debt and Fisher are engaged in the business of providing "Debt

Adjusting" services as that term is defined in OCGA § 18-5-1.

48.

Peak Debt and Fisher provided Debt Adjusting services to Plaintiffs while

they resided in the state of Georgia.

49.

Peak Debt and Fisher contracted for and accepted from Plaintiffs a charge, fee, contribution, or combination thereof in an amount in excess of 7.5% of the amount they paid monthly for distribution to Plaintiffs' creditors.

50.

Peak Debt's and Fisher's conduct is criminal and violates the provisions of the GDAA, and specifically OCGA § 18-5-2.

51.

From February 2017 through 2019, Peak Debt and Fisher received from Plaintiffs moneys for the payment of her creditors which Peak Debt and Fisher retained for more than thirty (30) days.

52.

Peak Debt and Fisher violated OCGA § 18-5-3.2(a) by holding the moneys Plaintiffs paid for distribution to Plaintiffs' creditors for more than thirty (30) days.

53.

Due to said violations of the GDAA, pursuant to OCGA § 18-5-4(b)(2), Peak Debt and Fisher are liable to Plaintiffs in an amount equal to the total of all fees, charges, and/or contributions paid by Plaintiffs to Peak Debt and Fisher, plus statutory damages in the amount of $5,000.00.

## THE GEORGIA FAIR BUSINESS PRACTICES ACT

54.

The Fair Business Practice Act ("FBPA"), at OCGA § 10-1-391 (a), states:

> The purpose of this part shall be to protect consumers and legitimate business enterprises from unfair or deceptive practices in the conduct of any trade or commerce in part or wholly in the state. It is the intent of the General Assembly that such practices be swiftly stopped, and this part shall be liberally construed and applied to promote its underlying purposes and policies.

55.

The FBPA at OCGA § 10-1-393 states that the following are violations of

the statute:

> (b)  By way of illustration only and without limiting the scope of subsection (a) of this Code section, the following practices are declared unlawful:
>
> . . .
>
>> (5)  Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have;
>
> . . .
>
>> (7)  Representing that goods or services are of a particular standard, quality, or grade or that goods

are of a particular style or model, if they are of
another;

. . .

(9)  Advertising goods or services with intent not
to sell them as advertised;

56.

The GDAA at OCGA § 18-5-4 states that a violation of the GDAA is also a
violation of the FBPA.

## **VIOLATIONS OF THE FBPA**

57.

Peak Debt's and Fisher's violations of the GDAA also violated the FBPA.

58.

Peak Debt and Fisher intentionally violated the FBPA when they violated
the GDAA.

59.

Peak Debt and Fisher are therefore liable to Plaintiffs, in addition to their
remedies under the GDAA, for their actual damages, for treble their actual
damages for the Peak Debt's and Fisher's intentional violation of the FBPA, and
for exemplary damages, plus reasonable attorneys' fees and costs of litigation.

## GEORGIA'S STATE PROCEDURAL PROHIBITION ON CLASS ACTIONS PURSUANT TO THE FBPA IS PRE-EMPTED BY FED. R. CIV. P. 23

60.

The FBPA, at OCGA § 10-1-399(a), states:

> Any person who suffers injury or damages as a result of a violation of Chapter 5B of this title, as a result of consumer acts or practices in violation of this part, as a result of office supply transactions in violation of this part or whose business or property has been injured or damaged as a result of such violations ***may bring an action individually, but not in a representative capacity***, against the person or persons engaged in such violations under the rules of civil procedure to seek equitable injunctive relief and to recover his or her general and exemplary damages sustained as a consequence thereof in any court having jurisdiction over the defendant[.]

Emphasis supplied.

61.

However, as the United States Supreme Court held in *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010):

> [Fed. R Civ. P. 23] says that if the prescribed preconditions are satisfied "[a] class action may be maintained" (emphasis added)--not "a class action may be permitted." Courts do not maintain actions; litigants do. The discretion suggested by Rule 23's "may" is discretion residing in the plaintiff: He may bring his claim in a class action if he wishes. And like the rest of the Federal Rules of Civil Procedure, Rule 23 automatically applies "in all civil actions and proceedings

in the United States district courts," <u>Fed. Rule Civ. Proc.</u>
<u>1.</u>

Id. at 400.

In sum, it is not the substantive or procedural nature or
purpose of the affected state law that matters, but the
substantive or procedural nature of the Federal Rule. We
have held since <u>Sibbach [v. Wilson & Co.</u>, <u>312 U.S. 1, 14</u>
(1941)], and reaffirmed repeatedly, that the validity of a
Federal Rule depends entirely upon whether it regulates
procedure.

Id. at 410.

62.

Further, the Eleventh Circuit held in *Lisk v. Lumber One Wood Preserving,*

*LLC*, <u>792 F.3d 1331</u> (11ᵗʰ Cir. 2015):

This appeal presents two issues. The first arises from a
conflict between <u>Federal Rule of Civil Procedure 23</u>,
which authorizes class actions including for consumer
claims of this kind, and the ADTPA[3], which creates a
private right of action but forbids private class actions.
We hold that Rule 23 controls.

---

[3] The Alabama Deceptive Trade Practices Act ("ADTPA") is Alabama's
equivalent law to Georgia's Fair Business Practices Act.

63.

Thus, any prohibition under Georgia's FBPA to the implication of Fed. R. Civ. P. 23 has been abolished, and this matter may proceed as a class action in federal court.

## CLASS ALLEGATIONS

64.

Plaintiffs seek to have this Court certify the following classes:

### CLASS 1

All persons who, while residing in the state of Georgia, received debt settlement or debt adjusting services from Peak Debt and Fisher on or after July 1, 2003 and from whom Peak Debt and Fisher accepted, directly or indirectly, any charge, fee, contribution, or combination thereof.

### CLASS 2

All persons, while residing in the state of Georgia, contracted for credit repair services from Peak Debt and Fisher, beginning five (5) years prior to the filing of this Complaint to the present, and Peak Debt and Fisher accepted a fee for said services before the services were rendered.

65.

On information and belief, the named Plaintiffs and the Plaintiff Class Members were solicited by HGI, Peak Debt, and Fisher through a standard

marketing scheme through which Peak Debt and Fisher offered Debt Adjustment services and credit repair services through Peak Debt's and Fisher's standard scheme. Such marketing and services are typical of those experienced by the Plaintiffs and the proposed Plaintiff Class Members.

66.

Peak Debt and Fisher commonly targeted Georgia residents for Debt Adjustment services and credit repair services.

67.

On information and belief, the fees collected by Peak Debt and Fisher from the proposed Plaintiff Class Members are uniformly assessed to every customer of Peak Debt and Fisher and can readily be determined from a ministerial review of the records of Peak Debt and Fisher.

68.

On information and belief, the contracts entered into between Peak Debt and Fisher and Plaintiffs are standard contracts which are substantially the same as the contracts Peak Debt and Fisher entered into with the Plaintiff Class Members.

69.

The names and addresses of the Plaintiff Class Members can readily be determined from a ministerial review of the records of Peak Debt and Fisher and

through the account statements of Peak Debt and Fisher pertaining to collection of such charges, fees, contributions, or combinations thereof.

70.

The membership of the classes is numerous and joinder of individual plaintiffs is impractical. On information and belief, Peak Debt and Fisher have provided Debt Adjustment services and credit repair services to hundreds of residents of the State of Georgia since July 1, 2003 (in the case of Debt Adjustment services), and hundreds of residents in the past five (5) years (in the case of credit repair services).

71.

There are questions of law and fact common to all members of the Plaintiff classes, and these common questions of law and fact predominate over any individual issues. The principle questions pertinent to the classes as a whole include:

a) Whether Peak Debt's and Fisher's standard means of doing business in debt adjustments, debt settlement, debt reduction, budget counseling, and debt management constitutes "Debt Adjustment" under OCGA § 18-5-1;

b) Whether Peak Debt and Fisher violated OCGA § 18-5-2 by accepting excessive fees from Plaintiff Class Members for the provision of Debt Adjustment services;

c) Whether Peak Debt and Fisher violated OCGA § 18-5-3.2(a) by failing to "disburse to the appropriate creditors all funds received from the debtor . . . within thirty days of receipt";

d) Whether Peak Debt, and Fisher fraudulently and materially misrepresented their ability to adjust or resolve the debts of the Plaintiff Class Members;

e) Whether Peak Debt and Fisher breached their fiduciary duty by failing to comply with the Georgia Debt Adjustment Act, by misrepresenting the willingness of creditors to resolve class member debt through debt settlement, by misrepresenting the ability of Peak Debt and Fisher to resolve class member debts, by failing to secure agreements with creditors of the class members to resolve their debts, and by performing no service of value for the fees Peak Debt and Fisher received;

f) Whether Peak Debt and Fisher violated CROA by misrepresenting that the credit repair services offered were actually being performed;

g) The liability of Peak Debt and Fisher for violations of the Georgia Debt Adjustment Act;

h) The liability of Peak Debt and Fisher for violations of the Credit Repair Organizations Act;

i) The liability of Peak Debt, and Fisher for violations of the Fair Business Practices Act;

j) The appropriate measure of damages and the appropriate remedies;

k) Defenses raised by Peak Debt, and Fisher;

l) The availability of statutory damages pursuant to OCGA § 18-5-4;

m) The availability of actual damages pursuant to 15 U.S.C. § 1679g;

n) The appropriateness of punitive damages pursuant to 15 U.S.C. § 1679g;

o) The availability of actual damages for Peak Debt's and Fisher's intentional violation of the FBPA pursuant to OCGA § 10-1-399;

p) The availability of trebled actual damages for for Peak Debt's and Fisher's intentional violation of the FBPA pursuant to OCGA § 10-1-399; and

q) The availability of reasonable attorneys' fees and costs of litigation for Peak Debt's and Fisher's intentional violation of the FBPA pursuant to OCGA § 10-1-399.

72.

The claims of the named Plaintiffs are typical of the claims of the Plaintiff Class Members, which all arise from the same operative facts and are based on the same legal theory, and Plaintiffs' claims will thus adequately represent those of the Plaintiff Class Members.

73.

The named Plaintiffs will fairly and adequately protect the interests of the Plaintiff Class Members. Plaintiffs have retained counsel with experience in class action litigation, and they are not aware of any interest that might cause them not to vigorously pursue this case.

74.

A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder is impracticable. The expense and burden of individual litigation make it virtually impossible for the members of the class to proceed individually, and it is therefore most efficient to resolve all claims based on Peak Debt's and Fisher's conduct in one forum.

75.

The Plaintiffs are aware of no difficulties that will be encountered in the management of this litigation that would render the action unmanageable. This is not a class action that will require an analysis of Peak Debt's and Fisher's conduct as to individual class members.

76.

Prosecution of separate actions by individual Plaintiff Class Members would create adjudications that would be dispositive of the interests of the other members not parties to the adjudication. Plaintiffs are not aware of any other pending actions against these Defendants for these same causes of action.

77.

Without a class action mechanism, members of the Plaintiff Class would be substantially impaired or impeded in their ability to protect their interests. The value of claims of the individual class members would be in an amount that makes prosecution outside of the class action uneconomical.

78.

A final judgment on the merits of the named Plaintiffs' claims would be fully dispositive of the claims and interests of those similarly situated who are not specifically named as plaintiffs in this action.

**WHEREFORE**, Plaintiffs being entitled to a trial by jury and judgment against Peak Debt and Fisher, pray for the following:

a) That summons be directed to Peak Debt and Fisher and served upon it as provided by law;

b) That Plaintiffs be designated class representatives for Class I and Class II as defined herein;

c) That Plaintiffs' counsel be designated class counsel for Class I and Class II as defined herein;

d) That the Class I be certified for all persons who, while residing in the state of Georgia, received debt settlement or debt adjusting services from Peak Debt and Fisher on or after July 1, 2003 and from whom Peak Debt and Fisher accepted, directly or indirectly, any charge, fee, contribution, or combination thereof;

e) That the Class II certified for all persons, while residing in the state of Georgia, contracted for credit repair services from Peak Debt and Fisher, beginning five (5) years prior to the filing of this Complaint to the present, and Peak Debt and Fisher accepted a fee for said services before the services were rendered;

f) That the Court hold a hearing as soon as practicable for the determination of class certification for Class I and Class II in accordance with Fed. R. Civ. P. 23;

g) For each violation of OCGA §§ 18-5-1 *et seq.* by Peak Debt and Fisher, that the Plaintiffs and the members of Class I be awarded an amount equal to all charges, fees, contributions, or combinations therefore paid to Peak Debt and Fisher plus $5,000.00 as allowed under OCGA §§ 18-5-1 *et seq.*;

h) For violations of the FBPA, that Plaintiffs and the members of Class I be awarded their actual damages, trebled damages, exemplary damages, and reasonable attorney's fees and costs;

i) For each violation of the 15 U.S.C. § 1679 committed by Peak Debt and Fisher, that the Plaintiffs and the members of Class II be awarded an amount equal to their actual damages, punitive damages in an amount that the Court may allow, and attorneys' fees and costs of the action;

j) That Peak Debt and Fisher be required to pay all monies herein referred to in subparagraph g) and h) into a common fund for the benefit of Class I, less expenses and attorneys' fees;

k) That Peak Debt and Fisher be required to pay all monies herein referred to in subparagraph i) into a common fund for the benefit of Class II, less expenses and attorneys' fees;

l) That the Court conduct a "fairness hearing," after due and proper notice to all members of Class I and Class II, and make such award of attorneys' fees and expenses as the Court deems appropriate from the common funds (as above referred to) and/or from Peak Debt and Fisher;

m) That Plaintiffs, individually and as class representatives for Class I and Class II, have a trial by jury;

n) That Plaintiffs and the members of Class I and Class II be awarded interest on any award granted, with such interest accruing from the time of the filing of this Complaint until the time final Judgment in this case is paid;

o) That Plaintiffs be awarded an incentive award from Peak Debt and Fisher for the benefit the named Plaintiffs has conferred on the Class I and Class II members through their commitment of time and expense in conducting this lawsuit; and

p) That Plaintiffs, individually and as class representatives of all others similarly situated as Class I and Class II, have such other relief as this Court deems proper.

Respectfully submitted, this 20th day of July, 2020.

**HURT STOLZ, P.C.**

/s/  James W. Hurt, Jr.
By:  James W. Hurt, Jr.
Georgia Bar No.:  380104

1551 Jennings Mill Road, Suite 3100-B
Watkinsville, Georgia 30677
(706) 395-2750
Facsimile: (866) 766-9245
jhurt@hurtstolz.com

**DEWOSKIN LAW OFFICE**

/s/ Daniel DeWoskin
By: Daniel DeWoskin
Georgia Bar No.: 220327

/s/  Sam Han
By Sam Han
Georgia Bar No.: 322284

535 North McDonough Street
Decatur, Georgia 30030
(404) 987-0026
Facsimile:  (404) 920-3341
dan@atlantatrial.com
sam@atlantatrial.com

**ATTORNEYS FOR PLAINTIFF
AND THE PUTATIVE CLASS**

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local R. 7.1(D), this is to certify that the foregoing complies with the font and point setting approved by the Court in LR 5.1(B). The foregoing SECOND AMENDED COMPLAINT FOR DAMAGES IN CLASS ACTION was prepared on a computer, using Times New Roman 14 point font.

Respectfully submitted, this 20th day of July, 2020.

**HURT STOLZ, P.C.**

/s/  James W. Hurt, Jr.
By:  James W. Hurt, Jr.
Georgia Bar No.:  380104

1551 Jennings Mill Road, Suite 3100-B
Watkinsville, Georgia 30677
(706) 395-2750
Facsimile: (866) 766-9245
jhurt@hurtstolz.com                    **ATTORNEY FOR PLAINTIFF**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have filed the SECOND AMENDED COMPLAINT FOR DAMAGES IN CLASS ACTION with the Clerk of Court via the CM/ECF system, which will automatically provide all counsel of record with email notification of this filing.

Andrew M. Stevens
astevens@lawstevens.com

Natalie Rowland
natalie_rowland@outlook.com

David Fisher
fisherlawllc@lawyer.com

Respectfully submitted, this 20th day of July, 2020.

**HURT STOLZ, P.C.**

/s/  James W. Hurt, Jr.
By:  James W. Hurt, Jr.
Georgia Bar No.:  380104

1551 Jennings Mill Road, Suite 3100-B
Watkinsville, Georgia 30677
(706) 395-2750
Facsimile:  (866) 766-9245
jhurt@hurtstolz.com                    **ATTORNEY FOR PLAINTIFF**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| VICKIE PHAN, individually and<br>Behalf of all others similarly situated, | ) <br> ) <br> ) | |
| Plaintiff, | ) <br> ) | CIVIL ACTION NUMBER: |
| v. | ) <br> ) | 1:19-CV-4613-JPB |
| PEAK DEBT CONSUMPTION, LLC<br>CHRIS MCCORMICK,<br>FISHER LAW GROUP, PLLC,<br>DAVID FISHER, and<br>HEGEMON GROUP<br>INTERNATIONAL, LLC, | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | <br><br>COMPLAINT – CLASS ACTION<br><br>JURY TRIAL DEMANDED |
| Defendants. | ) <br> ) | |

**EXHIBIT 1**

**"Peak Credit File Mastery Agreement"**



## Credit Clean Enrollment Form

Date _____

Full Name _____

Cell Phone _____

Social Security Number _____

Date of Birth _____

Personal Email Address _____

Home Address _____

_____

When Did You Move to This Address? _____

If Less Than 2 Years, Previous Address:

_____

_____

Privacy Guard (www.privacyguard.com) Login Information (must be enrolled in the Credit Protection program for $19.99 a month):

User Name _____

Password _____

Have you previously attempted credit repair either by yourself or through an outside firm? Yes _____   No _____



**PLEASE ATTACH A PHOTO OF YOUR DRIVER'S LICENSE AND A COPY OF A CURRENT (WITHIN 60 DAYS) UTILITY BILL OR BANK STATEMENT SHOWING YOUR RESIDENCE ADDRESS.**

**NOTE: THIS PROGRAM IS DESIGNED TO REMOVE DEROGATORY ITEMS FROM CREDIT REPORTS – IT WILL NOT REMOVE YOUR OBLIGATION TO PAY THE UNDERLYING DEBT. YOUR CREDIT SCORE MAY OR MAY NOT GO UP ONCE THE PROCESS IS COMPLETED, DEPENDING ON HOW MUCH POSITIVE CREDIT YOU STILL HAVE ON YOUR FILE ONCE IT HAS BEEN CLEANED.**



**NEW CLIENT CREDIT DATA QUESTIONNAIRE**

Have you ever used a credit or debit card at any of the following establishments?  Check all that apply.

| | |
|---|---|
| _____ Macy's | _____Home Depot |
| _____Sears | _____Verizon |
| _____Kmart | _____Wendy's |
| _____Delta Airlines | _____Michaels |
| _____Best Buy | _____Landry's |
| _____Saks Fifth Avenue | _____JP Morgan Chase |
| _____Lord & Taylor | _____Facebook Account |
| _____Panera | _____Ebay |
| _____Forever 21 | _____Orbitz |
| _____Sonic | _____Chilis Restaurants |
| _____Whole Foods | _____Uber |
| _____Arby's | _____Target Stores |
| _____WalMart | |

Have you ever worked for a US Government or State Government agency? _____Yes  _____No

Have you ever received any government benefits of any kind? _____Yes  _____No

Are you a veteran? _____Yes  _____No

Name (Print)_____         Date_____

Signature_____



# Services Agreement

This agreement between **Peak Credit File Mastery** ("**Peak Credit File Mastery**," "**We**," "**Our**," " **Ours**," or "**Us**") _____ ("**Customer**," "**You**" or "**Your**" ) is a legally binding agreement (the "**Agreement**"). Peak Credit File Mastery provides procedural services under this Program to assist its customers who desire to protect their credit file and finances from fraud and identity theft and facilitating removal of inaccurate, outdated, and possibly fraudulent information contained on their credit reports (the "**Services**"). For any efforts to be effective, You must be truthful and diligent in giving complete and accurate information to Us. Peak Credit File Mastery reserves the right to cancel this Agreement if We believe that You provided or may provide false or fraudulent information to Us, Your creditors or the credit bureaus.

Please note that We <u>do</u> <u>not</u> provide legal advice. We recommend that You consult Your attorney and/or thoroughly read the Fair Credit Reporting Act or the Bill of Rights before You seek advice from Us. Peak Credit File Mastery accepts no liability, nor responsibility for any damage or loss caused by Your use or misuse of the information provided in connection with the Services.

**Disclaimer:** _We are not a credit repair agency_.  We are procedural specialists that prepare and submit supporting documentation to remove derogatory items as described and requested from consumers that believe that they may have fallen victim to identity theft. By signing this Agreement, You acknowledge that there are inconsistencies, errors and items on your consumer credit reports that are unknown to You and permission was never requested, nor given, to have Your personal information provided to the public, sold for profit or not protected in what You feel is a proper way.

You may receive communications requesting additional information from the credit bureaus and individual creditors investigating a claim of fraud on one or more of your alleged credit accounts.  This is something that may or may not be the policy of the bureau or creditors at any given time.  You should NOT respond to any such requests for additional information. All necessary information will have been provided to them by Peak Credit File Mastery as part of the Services performed under this Agreement.

Under this Agreement, for the consideration stated herein, we will provide the following personal credit protection from fraud and inaccurate information reported by the credit bureaus:

This Program provides:

- *An evaluation of Your claim that Your current credit reports contain inaccurate, erroneous, false, possibly fraudulent, or obsolete information being reported by credit reporting agencies such as Experian, Equifax and Transunion; and*

- *All necessary correspondence in facilitating removal of inaccurate, erroneous, false, mis-reported, fraudulent or obsolete information in Your credit reports that is negatively impacting You; and*

- *Process and prepare documents needed to facilitate removal of all such negative record entries on credit reports alleged to belong to You; and*

- *Placing a temporary fraud alert on Your credit file to prevent any and all unauthorized use of your identity to obtain credit fraudulently; and*

- *Services are considered completed when potential fraud or identity theft related items, negative items, such as a public record, inquiry, collection account, charged-off account, bankruptcy, tax lien, student loan, medical collection, repossession, foreclosure, etc., have been deleted from your credit report.*

- *Note: - when identity theft is presumed, only entire effected accounts can be deleted from your credit file – individual late pays on an open, active account that is otherwise in good standing will not be deleted unless so requested by You.*

**Your Responsibility:**

- A completed Program Enrollment Form.
- Username and Password for credit monitoring services from Privacy Guard – available at www.privacyguard.com.
- A photo of your current, valid state Drivers' License.
- A photo of a recent utility bill or bank statement showing your current residence address – must be less than 60 days old.
- Adhere to the provisions of this Agreement.

To enable and authorize Us to assist You in this process, please fill out, sign and return a copy of the Limited Power of Attorney form attached to this Agreement as **Attachment 1**. You may revoke Your Limited Power of Attorney by filling out and signing the Revocation of Limited Power of Attorney form attached to this Agreement as **Attachment 2**.

Term – The term of this Agreement is three (3) months from its execution and all Services must be performed during that period. The Agreement may be extended for additional three (3) month periods by an amendment to this Agreement.

Limit of Services – This Agreement only applies to any negative items or inquiries on Your credit report at the time the initial service is rendered. Any new or additional negative items or inquiries will not be included in the initial Services fee. An additional fee will be due for any such items unless You enroll in our optional Maintenance Program.

Guarantee – Although We cannot guarantee by law a certain outcome, We know that by utilizing the Federal Law, certain state Privacy Laws, and the Fair Credit Reporting Act, We can assist You in correcting Your consumer credit reports and place a fraud alert on your file to assist in

protecting you against future data breaches and attempts to use your identity in a fraudulent manner.

Consideration – There is no fee to be paid by you in order for us to perform our obligations under this Agreement.  In lieu thereof, however, you agree to release Peak Credit File Mastery, Peak Debt Consumption, its predecessors, affiliates, its officers, owners, employees, contractors, attorneys, and the like from any and all liability, damages, penalties, fees, (or the like) known or unknown, that You have endured or experienced from your first engagement with Peak Debt Consumption (or any of the above entities or individuals) to the date of the execution of this Agreement.

Governing Law – This Agreement and any dispute arising from the performance or breach hereof will be governed by and construed and enforced in accordance with the laws of the State of Minnesota, without reference to the conflicts of laws principles of any jurisdiction.

Entire Agreement – This Agreement, including any exhibits to the Agreement, sets forth the entire Agreement regarding the subject matter of the Agreement, and supersedes and terminates all prior agreements and understandings between You and Us. No subsequent alteration, amendment, change or addition to this Agreement will be binding upon You and Us unless reduced to writing and signed by You and Us.

Non-Profit Credit Counseling Services – You have the right to hire a non-profit credit counseling service.

Customer Responsibilities and Communications – You agree to assist Us in answering certain security questions regarding Your identity and credit history as may be necessary to obtain Your credit reports.

Staffing– Peak Credit File Mastery may assign clerical staff, or others to perform work on Your case. You agree services in connection with this Agreement may be performed by any associate of Peak Credit File Mastery.

**Your Right to Cancel Agreement – You may cancel this contract without penalty or obligation at any time before midnight of the third day after the date on which you signed the contract. See the attached notice of cancellation form for an explanation of this right (Attachment 3).**

By signing this Agreement You agree to its conditions, agree to be truthful with Us, and You understand that no promises have been made by Us to You outside of this Agreement.

Signature:_____

3

## ATTACHMENT 1
### LIMITED POWER OF ATTORNEY

Limited Power of Attorney Disclosure

    Peak Credit File Mastery needs permission from You, to communicate with credit bureaus, creditors, data furnishers and others, in Your name and on Your behalf, including writing, signing and transmitting letters and electronic documents in Your name. This is a Limited Power of Attorney, granting permission to Peak Credit File Mastery to do this. It authorizes and directs Peak Credit File Mastery to act as Your disclosed and undisclosed agent when performing the Services you have retained Peak Credit File Mastery to provide. You may cancel Your authorization and this Limited Power of Attorney at any time by sending Peak Credit File Mastery Revocation of Limited Power of Attorney stating that You retract Your authorization. Without this written authorization and Limited Power of Attorney, Peak Credit File Mastery is unable to represent You, therefore canceling this authorization will close Your case. Please print a copy of the Agreement and this Limited Power of Attorney for Your records.

    Be it known that by submitting this form I, _____ hereby grant a Limited Power of Attorney to Peak Credit File Mastery and all persons in their employ, as my agent, to have the necessary power and authority to undertake and perform the following in my behalf:

·    I hereby give permission to Peak Credit File Mastery to sign all documents written on my behalf, as my duly appointed proxy, for the purpose of disputing inaccurate, erroneous, fraudulent, derogatory and obsolete credit information held on my credit report by consumer credit reporting agencies.

·    I appoint **Peak Credit File Mastery** as my agent to act in my behalf, as set forth in the following matters only; signing of correspondences addressed to credit bureaus, creditors and data furnishers, obtaining credit information over the telephone, fax, and/or through written correspondence from credit bureaus, creditors, data furnishers and/or collection agencies.

·    I have given Limited Power of Attorney to act on My behalf with government agencies in an effort to prepare and submit the needed documentation and granted by law to have immediate action taken by the credit bureaus regarding derogatory items on my credit report and possible fraud or identity theft.

    I understand that I have the right to revoke or terminate this limited power of attorney at any time, with a written Revocation of Limited Power of Attorney to Peak Credit File Mastery.

    According to the Consumer Credit File Rights, Under State and Federal Law, I have been made aware of the fact that I could attempt to challenge items specified above myself.

    _____ initials.

This "Limited Power of Attorney" is given to Peak Credit File Mastery in compliance with Section 611 of the Federal Fair Credit Reporting Act (FCRA).

Signature: _____

**ATTACHMENT 2**
**REVOCATION OF LIMITED POWER OF ATTORNEY**

I, the undersigned _____ residing address _____,
hereby revoke the Limited Power of Attorney dated _____ and granted to Peak Credit File
Mastery.

I hereby give notice to Peak Credit File Mastery and all other interested parties that I withdraw every power
and authority thereby given and declare the above Limited Power of Attorney void and of no further effect.

Executed this _____ day of _____201 _

at _____

Signature:

_____
DO NOT WRITE BELOW THIS LINE FOR OFFICE USE ONLY

By Peak Credit File Mastery _____

Date: _____

Date of Commencement: _____

6

**ATTACHMENT 3**
**NOTICE OF CANCELLATION**

You may cancel this contract, without any penalty or obligation, within three days from the date the contract is signed.

To cancel this contract at any time, please email a signed, dated copy of this cancellation notice, or any other written notice to Peak Credit File Mastery at info@peakdebt.me.

I hereby cancel the Agreement:

_____
Name of Client

_____
Signature of Client

_____
Date

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

VICKIE PHAN, individually and   )
Behalf of all others similarly situated, )
   )
     Plaintiff,     )
   )     CIVIL ACTION NUMBER:
v.          )
   )     <u>1:19-CV-4613-JPB</u>
PEAK DEBT CONSUMPTION, LLC )
CHRIS MCCORMICK,    )
FISHER LAW GROUP, PLLC,   )     COMPLAINT – CLASS ACTION
DAVID FISHER, and     )
HEGEMON GROUP     )
INTERNATIONAL, LLC,    )     JURY TRIAL DEMANDED
   )
     Defendants.    )
_____)

**<u>EXHIBIT 2</u>**

**<u>"Client Engagement Agreement"</u>**



**DEBT SETTLEMENT AND CONSUMPTION TERMS**

**AND CLIENT ENGAGEMENT AGREEMENT**

This Client Engagement Agreement ("Agreement") is made and entered into on this 26th day of  February , 2017, ("Effective Date") by and between Peak Debt Consumption, LLC (Peak) on the one side, and Vickie Phan ("Client") on the other side.  (Individually, Party, Collectively, Parties)

1.         Purpose.  Peak shall engage an attorney or law firm based out of Salt Lake City, Utah and who (as needed) consults with attorneys in other states, who performs legal work and debt negotiations on behalf of Peak and Client.  Peak is a debt consumption company. Client desires to enter into this Agreement with Peak, who engages an attorney to perform various financial and debt-related services, including, but not limited to, creating a custom financial plan, the negotiation of Client's debts to obtain more favorable terms, the facilitation of payments to creditors under new terms, and to take steps to promote the transfer of Client's debt reporting history away from the client's history with credit bureaus. Peak is working with Credit Precision - a credit repair partner - to provide help to the Client in getting their credit history as accurate as possible. Peak has negotiated with Credit Precision to provide this service as an additional product offering in connection with Peak's services performed for the Client. A separate Agreement follows which outlines the credit repair process and services.

In some states, only a licensed attorney may perform debt relief services and in such cases, only attorney, not Peak, shall perform the services hereunder.

2.         Term.  The term of this agreement shall begin on the Effective Date and shall continue for eleven months, or until Peak has completed its services, or until terminated by either party pursuant to this Agreement.

3.         Accounts.  Through its staff and attorney(s), Peak, will attempt to negotiate and obtain more favorable terms on the following accounts and for the following fees.

| Creditor | Account # | Amount | % Paid By Client | $ Paid By Client |
|---|---|---|---|---|
| Retainer for Consultation and Credit Analysis | N/A | N/A | N/A | $3,500 |
| PayPal | ████5920 | $7,622.00 | 35.00 % | $ 2,667.70 |
| WalMart | ████5732 | $3,746.00 | 35.00 % | $ 1,311.10 |
| Bank of America | ████89668 | $4,171.00 | 35.00 % | $ 1,459.85 |
| Bank of America | ████0452 | $19,947.00 | 35.00 % | $ 6,981.45 |
| | | | 35.00 % | $ |
| **Total Amount to be Placed In Escrow** | | | **$ 12,420.10** | |

4.        Payment Terms. Peak does not require any up-front fees for any debt settlement or any up-front payment for credit repair services.  Rather, all of Client's funds will be placed into an escrow/trust account at an independent, insured financial institution until the funds can be earned and disbursed in accordance with applicable laws.  Client shall remain the owner of Client's funds held in escrow/trust and Client may demand a return of the same at any time, if not already disbursed to Peak, its attorney(s), our credit repair service provider Credit Precision, or Client's creditors in accordance with this Agreement.  Fees shall be deemed earned on a per account basis, whenever Client successfully obtains a new written payment plan or settlement from a creditor, and Client makes at least one payment under such new plan, in compliance with the Telemarketing Sales Rule 16 CFR Part 310. In addition, the credit repair service provider, Credit Precision, will be paid from the escrow account as credit repair services are performed for the Client. Peak and its attorney shall be entitled to no portion of Client's trust/escrow funds, until they have successfully negotiated and made a payment on at least one of Client's debts, as outlined above.  Client understands that while Peak and attorney will attempt to negotiate all of the above debts, their first $3,500 fee is only for an initial consultation and credit evaluation; regardless, that $3,500 will also not be deemed earned until at least one debt is negotiated and one payment paid thereunder.

5.        Refunds and Returns. If Client requests a return of funds, or if attorney or Peak elect to cancel this contract Client is entitled to only those funds not already earned and disbursed to attorney, Peak, Credit Precision, Client's creditors, and/or other third parties allowed under this contract or paid at the specific direction of Client.  Peak's fees shall be earned on a per account basis, whenever Peak successfully obtains a new written payment plan or settlement from a creditor, and Client, through Peak, makes at least one payment under such new plan, in compliance 16 CFR Part 310.

Client is responsible for paying the initial $3,500 consultation retainer and depositing thirty-five percent (35%) of Client's debts submitted for negotiation, into the trust/escrow account. Such amount is listed above and can be deposited into the escrow account either in a single lump sum or multiple payments. From the 35% of gross debt deposited into escrow.  Peak is immediately entitled to the $3,500 Retainer upon successful completion of the initial consultation, credit analysis and upon successful negotiation of the first debt and first payment thereunder.  Subsequently, Peak shall have immediate rights to the seven percent (7%) of the gross submitted debt to cover administrative, legal, and negotiation costs and fees, upon each successful negotiation and initial payment on a per account basis.  Thus, Peak will attempt to settle Clients debts for an average payout of 28%, or less, so that funds in escrow will cover the total funds paid out to Client's creditors in settlements.  Credit repair fees are considered earned and payable when services are performed and any claim to refunds will be outlined in a separate Credit Precision agreement with Client.

6.        Remaining Funds After Settlement.  Peak will also be entitled to retain any difference between the 28% of

gross debts remaining in Client's escrow account and the amount that Attorney and Peak pay to settle with Client's creditors.  Client acknowledges that Peak has the authority, in their sole discretion, to direct any involved escrow/trust officer or representative to prepare for and make disbursements to its attorney, Peak, Client's various creditors, and/or other third parties authorized under this contract.  All fees are exclusive of federal, state, municipal, or other government, excise tax, use, or like taxes on services sold herein.

7.          Client Pre-Authorization of Settlement. Client hereby pre-authorizes Peak to settle any of the scheduled debts for any amount not exceeding 28% of the total owed to the creditor.  Peak shall strive to settle for less than 28% and to communicate with client as settlements are reached.  However, due to the time-critical nature of these negotiations, Client agrees that Peak may settle any account for 28% or less of the total owed and wire funds to the creditor as part of such settlement.

8.          Merchant Services.  Client acknowledges that Client shall be responsible for the merchant processing fees associates with all transfers of Client's funds, which fees are approximately 3.99% and are subject to change.  Charges may appear on Client's bank statements as being from "Peak Debt Settlement Corporation," or any other merchant processor that Peak chooses to use.  Client acknowledges that if Client files a chargeback on any funds to Peak, its attorneys, or their affiliates, Client shall be responsible for any processing fees incurred and under no circumstances shall Client be entitled to any amount more than what was charged from the card provided by Client.

9.          Credit Repair Services. Client acknowledges that Peak's credit repair service provider, Credit Precision, will perform credit repair activities for the Client, and Client hereby authorizes Credit Precision to obtain copies of Client's credit information from Peak or any credit reporting agency as necessary, in order to perform repair activities for the Client. With respect to the credit repair services that Credit Precision will perform for Client, Client hereby authorizes Credit Precision to receive payments from the escrow account by Peak as credit repair services are performed. Details of payment, possible rights of refund, and other credit repair details will be outlined in separate Credit Repair agreement between Client and Credit Precision.

10.         Cancellation.  Client, in addition to any right to otherwise revoke an offer, may cancel the sale and receive a full refund of escrow funds up to midnight of the third business day after the receipt of the merchandise or premium, whichever is later.  Because Peak will begin providing the Services immediately upon this engagement, the 3-business day rescission period starts now. All Client funds placed in escrow by Peak shall remain Client's property until disbursed to Peak for Peak's fees, or dispersed to creditors pursuant to this Agreement. Should the eleven (11) month term of this contract expire without a settlement of all of Client's debts, Client, on its own accord, may decide whether to continue with its engagement with Peak. If Client decides that termination of the contract is in the best interest of the Client, Client is entitled to a return of all remaining funds in escrow.

11.         Breach of Contract.  After this contract is signed by all parties, if Client at any time makes direct contact with Client's creditors or engages in any type of negotiation with Client's creditors it will breach the "Limited Power of Attorney" between Peak, its attorney(s) and Client and this contract will (at Peak's sole discretion) be immediately voided.  If this contract is breached and voided, Peak will immediately disburse to itself (pursuant to law) any remaining processing fees and its normal profits from clients' fees held in escrow.  In no event shall this amount be less than 40% of remaining funds.  Client also agrees to sign and return the "Debt Settlement and Release Agreement" prior to release and return of Clients remaining funds to Client.

12.         Performance.  Client understands that Peak will perform to the best of their abilities, but there can be circumstances that can delay the settlement, consumption, and completion of Clients accounts. Peak strives to complete all negotiation, settlement, and consumption despite Client's full payment and performance.

13.     No Legal, Financial or Tax Advice Provided.  No financial, legal, or tax advice or counsel is given, or shall be deemed to have been given by Peak.

14.     Legal Advice by Peak.  Client is retaining Peak and paying Peak for limited counsel and advice. However, to ensure compliance with requirements imposed by the IRS, we inform you that any tax advice contained in this communication, unless expressly stated otherwise, was not intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax-related penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any tax-related matter(s) addressed herein.

15.     Indemnification.  Client shall assume, pay, indemnify, hold harmless and reimburse Peak, its attorney(s) and their owners, employees, agents, affiliates, contractors, successors and assigns for all liabilities, damages, claims, suits, settlements, judgments, investigations, costs, and expenses (including reasonable attorney's fees and court costs) directly or indirectly incurred by Peak or its attorney(s) to the extent the same are related in any way to this Agreement or to Client's use of the Services.  Upon receipt of any demand or claim by Peak related to Client, Peak may elect to turn the defense and resolution of such claim over to Client who shall bear all costs and expenses and shall promptly investigate and settle or otherwise resolve any such claim to Peak's full satisfaction.  Alternatively, Peak may elect to defend any such claim on their own and then to obtain reimbursement from Client.  In either case, Peak and Client shall cooperate and share necessary information in any such defense.

16.     Client's Protected Information. Client realizes that Peak may be required by law to provide certain information about Client if Peak receives a subpoena from a court or regulator with competent authority. For this reason, Peak shall take reasonable efforts to maintain its client privilege and will not share sensitive privileged information with Peak or other non-attorney parties without Client's written permission. Peak will only turn over materials by subpoena after a court rules that the requested information is not privileged or is otherwise subject to the subpoena power.  In most cases, the Client has the absolute right to waive the attorney-client confidentiality privilege. Similarly, if Client institutes a consumer complaint or litigation against Peak or its attorney, Client's rights under the privilege are deemed waived and Peak may use such information in their defense and/or in an affirmative action against Client.

17.     Limitation of Liability. Neither Party shall be liable for any consequential, incidental, special, or indirect damages (including, but not limited to, loss of profits, goodwill, use, data, credit score change, any change, closing, or effect of any credit lines or accounts of Client, any litigation against Client, or other intangible items) whether or not the other Party has been advised of the possibility of such damages or losses.  Peak is not responsible for any failure of a third-party "Do Not Call" (DNC), or wireless list provider to deliver its data accurately, completely, or in a timely way. Peak is not responsible for damages resulting from improper or incomplete use by Client of Peak's Services, or if Client does not adhere to this or any other Agreement between itself and Peak.  With respect to any other damages, Peak's or Peak's attorney's liability hereunder shall in no event exceed an amount equal to the amount paid by Client to Peak in the month prior to a claim being made, regardless of the basis for the claim.  Client understands that this is a significant limitation on Client's right to collect from Attorney and Peak and Client should not proceed if Client does not agree.  Peak shall not be bound by any typographical or other error or misprint in its marketing materials or online purchase websites.

18.     Warranties.  Except as otherwise provided herein, THE SERVICES ARE PROVIDED "AS IS" WITHOUT ANY EXPRESS OR IMPLIED WARRANTY OF ANY KIND INCLUDING WARRANTIES OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE. IN NO EVENT, SHALL PEAK, OR THEIR AFFILIATES BE LIABLE FOR ANY DAMAGES WHATSOEVER (INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOSS OF PROFITS, DAMAGED CREDIT, LOSS OF INFORMATION) ARISING OUT OF THE USE OF OR INABILITY TO USE THE SERVICES, EVEN IF PEAK HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

19.     Legal Relationship.  (1) By forming this Agreement, no agency, employment, ownership, partnership, or joint venture relationship is created between Client and Peak beyond that of independent contractors. (2) The relationship of Client to attorney is attorney-Client on a limited representation basis limited to the duties outlined in this contract.

20.     Choice of Law & Venue.  This Agreement shall be governed by and construed per the laws of the State of Utah without regard to normal choice-of-law and conflict-of-law principles.  The parties agree that the state courts in Salt Lake County, State of Utah, shall have exclusive jurisdiction and venue over any legal dispute between the parties.  The parties consent to such jurisdiction at this time.  The prevailing party in any legal dispute between the parties shall be entitled to their reasonable attorney's fees and court costs.

21.     Notices.  All notices which may or shall be given under this Agreement shall be made by certified mail to the address mentioned above or to such addresses as are otherwise designated in writing by the parties hereto.  If either party has changes its address, a written notice thereof shall be given to the other party.

22.     Modification of Agreement.  The Parties agree that this Agreement may only be modified with the written consent of all Parties.  No act or omission by either Party, under any circumstances, shall constitute an amendment to any obligation, right, or term of this Agreement.

23.     Entire Agreement.  This Agreement, along with any addendum, schedule or exhibit incorporated by reference, constitutes the entire understanding and agreement of the parties regarding the subject matter hereof and supersedes all prior and contemporaneous communications, understandings, and agreements, either written or oral.

24.     Force Majeure.  Neither Party shall be liable for failure or delay in performing its obligations under this Agreement if such failure or delay is due to circumstances beyond its reliable control, including without limitation fire, flood, windstorm, terrorist action, strike or other labor disturbance, unavailability of telecommunications or other third-party services, connectivity failures, hacking or other third-party intrusion into the computer(s) of Peak, or failures of third-party hardware or software.

25.     Mandatory Arbitration and Class Action Waiver:  All parties agree to be bound by a requirement that all disputes related to this agreement be resolved via mandatory and binding arbitration rather than through State or Federal courts.  The parties, upon mutual consent or where required by law, may choose mediation of the dispute prior to arbitration.  NOTWITHSTANDING, EACH PARTY WAIVES THE RIGHT TO LITIGATE IN COURT OR ARBITRATE ANY CLAIM OR DISPUTE AS A CLASS, EITHER AS A MEMBER OF A CLASS, OR AS A REPRESENTATATIVE.

26.     Arbitration Notice. Prior to arbitrating any dispute, you must first contact us in writing at info@peakdebt.me, so that we can work to resolve the dispute.  If we cannot resolve a dispute within sixty (60) days of notification, you do not respond to our efforts to contact you, or you fail to engage in good-faith settlement discussions with us, then the following procedures shall apply.  All disputes arising out of or relating to this Agreement (including its formation, performance, or alleged breach), your use of the Services and/or any purchases you make from us will be exclusively resolved under confidential binding arbitration held in accordance with the Rules of the American Arbitration Association under its Commercial Arbitration Rules and Supplementary Procedures for Consumer-Related Disputes.  The arbitrator's award will be binding and may be entered as a judgment in any court of competent jurisdiction. To the fullest extent permitted by applicable law, no arbitration under this Agreement will be joined to an arbitration involving any other party subject to this Agreement, whether through class arbitration proceedings or otherwise.  Notwithstanding the foregoing, Peak will have the right to seek injunctive or other equitable relief in state or federal court to enforce this Agreement or prevent an infringement of a third party's rights.  The arbitrator's decision shall be based upon the substantive laws of the State of Utah without regard to its principles of conflicts of law.  Arbitration proceedings shall be conducted in English

and shall be conducted in a manner that preserves confidentiality.

27.      Non-disparagement.  Both Parties agree that the subject matter of this relationship is personal, and agree to keep confidential this Agreement, any terms herein, and their relationship with the other Party.  Additionally, both Parties agree, during the term of this Agreement, and indefinitely after termination, to not disparage, defame, slander, insult, denigrate, vilify, speak ill of, embarrass, or attempt to engage in any of the foregoing, the other Party under any circumstances.

28.      Confidentiality.  In addition to the other confidentiality requirements herein, the Parties acknowledge that Peak will obtain NPI (non-public information) and other sensitive data about each Client.  Peak agrees to duly safeguard such data and NPI in accordance with applicable law, and shall take all possible precautions to ensure that no data breach occurs.  Peak shall not share any NPI with any other parties, entities, or individuals unless required by law to do so, or Client gives written permission to do so.

29.      Headings. The headings used in this Agreement are for convenience only and do not alter or affect this Agreements, or any provisions to which they refer.

30.      Survival.  Any provision of this Agreement, which by its nature, would naturally survive the termination of this Agreement, shall expressly survive any termination, including without limitation, those provisions related to indemnity, compliance with law, intellectual property, non-circumvention, and notices.

[SIGNATURES ON NEXT PAGE]

Accepted and agreed to by:

**Client:**

Signature: _____

Print Name: Vickie Phan

Date: _____

**Peak Debt Consumption, LLC**

Signature of the Company: _____

Print Name: _____

Title: _____

Date: _____

**Law Offices, PLLC**

Signature of Law Firm: _____

Print Name: _____

Title: _____

Date: _____

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

VICKIE PHAN, individually and )
Behalf of all others similarly situated, )
                             )
     Plaintiff,          )
                             )     CIVIL ACTION NUMBER:
v.                        )
                             )     <u>1:19-CV-4613-JPB</u>
PEAK DEBT CONSUMPTION, LLC )
CHRIS MCCORMICK,        )
FISHER LAW GROUP, PLLC,   )     COMPLAINT – CLASS ACTION
DAVID FISHER, and         )
HEGEMON GROUP          )
INTERNATIONAL, LLC,      )     JURY TRIAL DEMANDED
                             )
     Defendants.        )
_____)

**<u>EXHIBIT 3</u>**

**<u>"Joint Escrow Agreement"</u>**



## JOINT ESCROW INSTRUCTIONS

Fisher Law Group, PLLC (Attorney), Peak Debt Consumption, LLC (Peak) and Vickie Phan (Client), hereby agree to the following terms regarding all Client funds placed in escrow with Peak's then-current designated escrow for future payment of Attorney's and Peak's fees and dispersments to Client's creditors:

1. Client funds shall be held in escrow to protect Attorney's and Peak's time and efforts, and to prepare for and make disbursements to Client's various creditors.
2. All funds initially placed by Client in escrow shall remain the Client's property until earned/converted and disbursed in accordance with these terms, and according to the parties' separate Debt Consumption Terms and Client Engagement Agreement ("Client Agreement").
3. Client agrees that Escrow Agent shall honor all directions from Peak's then-current appointed contact person, regarding disbursements to be made to Attorney, Peak, Client's creditors, or other third parties whom Client and Peak agree should receive funds pursuant to the Client Agreement.
4. Client agrees that it shall deposit into escrow 35% of the total amount presently owed to each creditor that Client wishes to enroll with Attorney and Peak for debt settlement and consumption.
5. Attorney and Peak will take no action regarding any individual creditor for which Client has not deposited a full 35% of the total claimed by the creditor to be owed to the creditor.
6. From the 35% of the total debt deposited into escrow, Attorney will withdraw 7% of the total owed to be paid to Attorney and Peak according to terms of a separate agreement between Attorney and Peak.
7. This will leave 28% of the total debt remaining in escrow available for distribution as settlements are reached with each creditor.
8. Escrow Agent shall promptly disburse Client funds to specified Client creditors or other third parties according to Attorney's directives. Attorney agrees that any such instructions shall comply with the Client Agreement or are otherwise made with the consent of Client.
9. Upon request by Attorney, Peak, or Client, Escrow Agent shall provide to the requesting party a full written accounting of the status of Client's funds and any disbursements made.
10. Escrow Agent shall not honor and request for disbursement from any person other than the then-current Attorney-designated contact person.
11. At Attorney's and Peak's discretion, if there is any delay in escrow processing or other unforeseen circumstance making the escrow process ineffective to Attorney, Peak, or Client, Attorney or Peak may redirect Client funds into a different escrow, or into a client trust account at an insured financial institution of its choosing, and may disperse such funds directly in accordance with the Client Agreement at that time, rather than in accordance with these escrow instructions.

Rights of Escrow Agent.  To induce Escrow Holder to act pursuant to the terms of this Agreement, the parties hereby make the following covenants and agreements:

1. Escrow Agent shall be entitled to rely on this Agreement for all such direction.
2. Escrow Agent is acting as a third party and shall have no liability hereunder, except as provided herein.
3. It is agreed that the duties of Escrow Agent are only as in this Agreement specifically provided, and are purely ministerial in nature.
4. The parties each hereby release Escrow Agent from any act done, or omitted to be done by Escrow Agent in good faith and in the performance of its duties hereunder.

5. The parties shall each jointly and severally indemnify and hold harmless Escrow Agent from and against all costs, claims, demands, suits, judgments and liabilities of whatever nature including reasonable attorneys' fees incurred in connection with performance by the Escrow Agent of their duties hereunder, except with respect to action or omissions taken or suffered by reason of gross negligence or willful misconduct on the part of the Escrow Agent.

6. Escrow Agent will not be responsible in any respect for form, execution, validity, value or genuineness of documents or securities deposited hereunder, or for any description therein, or for the identity, authority or rights of persons executing or delivering or purporting to execute or deliver any such document, security or endorsement.

## AUTHORIZED SIGNATURES ON THE FOLLOWING PAGE

Accepted and agreed to by:

**Client:**

Signature: _____

Print Name: Vickie Phan

Date: _____

**Peak Debt Consumption, LLC**

Signature for the Company: _____

Print Name: _____

Title: _____

Date: _____

**Fisher Law Group, PLLC**

Signature for the Company: _____

Print Name: _____

Title: _____

Date: _____

**Escrow Agent**

Name of Escrow Agent: _____

Signature for Escrow Agent: _____

Title and Date: _____

**Wiring Instructions:**

Please send your payment to the following account:

Deep Creek, LLC

ESCROW ACCOUNT

2850 E Cottonwood Parkway, #500

Cottonwood Heights, UT 84121

(888)406-5821

Bank Information:

Chase Bank

Cottonwood/Highland

6275 Highland Drive

Salt Lake City, UT 84121

(801) 481-5232

Routing Number: ███████

Account Number: ███████

**Credit Card Payments:**

You may call in your escrow payment:

(619) 517-5276, Ask for David.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

VICKIE PHAN, individually and   )
Behalf of all others similarly situated, )
   )
      Plaintiff,   )
   )   CIVIL ACTION NUMBER:
v.   )
   )   1:19-CV-4613-JPB
PEAK DEBT CONSUMPTION, LLC )
CHRIS MCCORMICK,   )
FISHER LAW GROUP, PLLC,   )   COMPLAINT – CLASS ACTION
DAVID FISHER, and   )
HEGEMON GROUP   )
INTERNATIONAL, LLC,   )   JURY TRIAL DEMANDED
   )
      Defendants.   )
_____)

**EXHIBIT 4**

**"Credit Repair Services Agreement"**

In order to proceed with Credit Repair, the following documents will need to be emailed to Peak Debt Consumption:

- Driver's License (Color)
- Social Security Card (Color)
- Utility Bill or Bank Statement (Must have your current Address and Name on it)

Once all settlement funds have been received, a Credit Repair Specialist at Credit Precision will be contacting you within the next 3 business days.

2/26/18

Signature                                          Date

ID: 124263 Signed: 2018-02-26T17:45:24-06:00

**Consumer Credit File Rights Under State and Federal Law**

You have a right to dispute inaccurate information in your credit report by contacting the credit bureau directly. However, neither you nor any 'credit repair' company or credit repair organization has the right to have accurate, current, and verifiable information removed from your credit report. The credit bureau must remove accurate, negative information from your report only if it is over 7 years old. Bankruptcy information can be reported for 10 years.

You have a right to obtain a copy of your credit report from a credit bureau. You may be charged a reasonable fee. There is no fee, however, if you have been turned down for credit, employment, insurance, or a rental dwelling because of information in your credit report within the preceding 60 days. The credit bureau must provide someone to help you interpret the information in your credit file. You are entitled to receive a free copy of your credit report if you are unemployed and intend to apply for employment in the next 60 days, if you are a recipient of public welfare assistance, or if you have reason to believe that there is inaccurate information in your credit report due to fraud.

You have a right to sue a credit repair organization that violates the Credit Repair Organization Act. This law prohibits deceptive practices by credit repair organizations.

You have the right to cancel your contract with any credit repair organization for any reason within 3 business days from the date you signed it.

Credit bureaus are required to follow reasonable procedures to ensure that the information they report is accurate. However, mistakes may occur.

You may, on your own, notify a credit bureau in writing that you dispute the accuracy of information in your credit file. The credit bureau must then reinvestigate and modify or remove inaccurate or incomplete information. The credit bureau may not charge any fee for this service. Any pertinent information and copies of all documents you have concerning an error should be given to the credit bureau.

If the credit bureau's reinvestigation does not resolve the dispute to your satisfaction, you may send a brief statement to the credit bureau, to be kept in your file, explaining why you think the record is inaccurate. The credit bureau must include a summary of your statement about disputed information with any report it issues about you.

The Federal Trade Commission regulates credit bureaus and credit repair organizations.

For more information, contact:

The Public Reference Branch Federal Trade Commission Washington, D.C. 20580

Signature:

Print Name: Vickie Phan

Date: 2/26/18

ID: 124263 Signed: 2018-02-26T17:45:24-06:00

**Credit Precision Information Statement**

This Information Statement contains important information about your rights under federal and state law regarding your credit report and the services of Credit Precision. Please review this information carefully before signing your Credit Precision Credit Repair Services Agreement.


**Services Performed by Credit Precision**

- Perform initial consultation to evaluate Client's current credit reports as currently maintained by the three national credit reporting agencies; Transunion, Equifax, and Experian, and any other credit reporting agencies identified by Client and to identify inaccurate, erroneous, false, or obsolete information ("Dispute Items") in such credit reports.
- To advise Client as to the necessary steps to be taken by Client, in conjunction with Credit Precision, to dispute any Dispute Items contained in the Client's credit reports.
- To prepare all correspondence necessary to legitimately dispute any Dispute Items that may be contained in Client's credit reports.
- To submit up to 5 rounds of correspondence (electronic or US mail) to the CRAs as necessary for the credit repair process.
- To contact and notify the CRAs that all enrolled Debt Items settled by Peak are presented accurately on the Client's credit file.


Credit Precision shall perform all services identified above for a maximum term of 180 days.


**Total Amount You May Have to Pay**

In exchange for the services identified above, Peak Debt Consumption has negotiated an advantageous rate for credit repair services from Credit Precision and has agreed to pay Credit Precision directly from the escrow account set up between you and Peak.


The total amount Peak will disburse on your behalf is $750 - paid from time to time directly from the escrow account as repair services are performed.


The schedule of payments for credit repair services from the escrow account are as follows:


- Initial 20% of the agreed price for credit repair service will be deemed as earned and payable once the initial consultation is performed.
- Additional 30% of the agreed to price for credit repair services will be deemed as earned and payable once all the items to be disputed are indentified, Client letters containing said items are generated and letters are either electronically submitted or mailed via first class U.S. delivery to all CRAs (this is expected to occur within 10-20 days of signup).
- The Balance of 50% is deemed earned and payable after a maximum of (5) rounds of dispute submissions and once the final enrolled debt consumption item is deemed negotiated and a settlement letter is received by Peak.

ID: 124263 Signed: 2018-02-26T17:45:24-06:00

**Your Rights Under Federal and State Law**

The following disclosure applies to residents of the following states: ARIZONA, ARKANSAS, CALIFORNIA, FLORIDA, ILLINOIS, INDIANA, MASSACHUSETTS, NEW HAMPSHIRE, OHIO, PENNSYLVANIA, TENNESSEE, TEXAS, WASHINGTON

You have a right to obtain a copy of your credit file from a consumer credit reporting agency.

You may be charged a reasonable fee by the credit reporting agency. There is no fee, however, if you have been turned down for credit, employment, insurance, or a rental dwelling because of information in your credit report within the preceding 60 days. The consumer credit reporting agency must provide someone to help you interpret the information in your credit file.

You have a right to dispute inaccurate information by contacting the consumer credit reporting agency directly. However, neither you nor any credit repair company or credit services organization has the right to have accurate, current, and verifiable information permanently removed from your credit report. Under the Federal Fair Credit Reporting Act, the consumer credit reporting agency must remove accurate, negative information from your report only if it is over seven years old. Bankruptcy information can be reported for 10 years.

If you have notified a credit reporting agency in writing that you dispute the accuracy of information in your credit file, the consumer credit reporting agency must then reinvestigate and modify or remove inaccurate information. The consumer credit reporting agency may not charge a fee for this service. Any pertinent information and copies of all documents you have concerning an error should be given to the consumer credit reporting agency.

If reinvestigation does not resolve the dispute to your satisfaction, you may send a brief statement to the consumer credit reporting agency to keep in your file, explaining why you think the record is inaccurate. The consumer credit reporting agency must include your statement about disputed information in any report it issues about you.

You have a right to cancel the contract for any reason within five working days from the date you signed it. If for any reason you do cancel the contract during this time, you do not owe any money.

You have a right to sue a credit services organization if it misleads you.

You should be aware that non-profit credit, budget, and debt counseling services may be available to assist you with your

budgeting and credit repair needs.

## Surety Bond Information

If you live in the following states, you have the right to proceed against the surety bond maintained by North American Specialty Insurance Company located 650 Elm Street, Manchester, New Hampshire 03101:

| | | | | |
|---|---|---|---|---|
| Arizona | Florida | Massachusetts | Pennsylvania | Washington |
| Arkansas | Illinois | New Hampshire | Tennessee | |
| California | Indiana | Ohio | Texas | |

| Registered Agents State | Registered Agent | Address |
|---|---|---|
| Arizona | CT Corp System | 3800 North Central Ave, Ste. 460, Phoenix, AZ 85012 |
| Arkansas | The Corporation Company | 124 West Capitol Ave, Ste. 1900, Little Rock, AK 72201 |
| California | CT Corporation | 818 W. Seventh St., Ste. 930, Los Angeles, CA 90017 |
| Colorado | The Corporation Company | 7700 E Arapahoe Rd, Suite 220, Centennial, CO 80112 |
| Florida | CT Corporation | 1200 South Pine Island Rd, Plantation, FL 33324 |
| Georgia | Credit Precision | 280 Interstate North Cir SE, Ste. 500, Atlanta GA |
| Illinois | CT Corporation | 208 S. LaSalle St., Ste. 814, Chicago, IL, 60604 |
| Indiana | CT Corporation (Patrick Jones) | 150 West Market St., Ste. 800, Indianapolis, IN 46204 |
| Massachusetts | CT Corporation | 155 Federal St., Ste. 700, Boston, MA, 02110 |
| New Hampshire | CT Corporation | 9 Capitol St., Concord, NH 03301 |
| North Carolina | CT Corporation | 160 Mine Lake Ct., Suite 200, Raleigh, NC 27615 |
| Ohio | CT Corporation | 1300 East 9th Street, Cleveland, Ohio 44114 |
| Pennsylvania | CT Corporation System | 116 Pine St # 320, Harrisburg, PA 17101 |
| Tennessee | CT Corporation | 800 S. Gay St., Ste. 2021, Knoxville, TN 37929 |
| Texas | CT Corporation | 701 Brazos, Suite 720, Austin, TX 78701 |
| Washington | CT Corporation | 501 Union Ave SE, #120, Olympia WA 98501 |

Principal Business Address

Credit Precision's principal business :

280 Interstate North Circle SE, Suite 500,

Atlanta, GA 30339.

ID: 124263 Signed: 2018-02-26T17:45:24-06:00

**The following disclosure applies to CALIFORNIA Residents:**

CONSUMER CREDIT FILE RIGHTS UNDER

STATE AND FEDERAL LAW

You have a right to obtain a copy of your credit file from a consumer credit reporting agency.

You may be charged a reasonable fee not exceeding eight dollars ($8). There is no fee, however, if you have been turned down for credit, employment, insurance, or a rental dwelling because of information in your credit report within the preceding 60 days. The consumer credit reporting agency must provide someone to help you interpret the information in your credit file.

You have a right to dispute inaccurate information by contacting the consumer credit reporting agency directly. However, neither you nor any credit repair company or credit services organization has the right to have accurate, current, and verifiable information removed from your credit report. Under the Federal Fair Credit Reporting Act, the consumer credit reporting agency must remove accurate, negative information from your report only if it is over seven years old. Bankruptcy information can be reported for 10 years.

If you have notified a credit reporting agency in writing that you dispute the accuracy of information in your credit file, the consumer credit reporting agency must then reinvestigate and modify or remove inaccurate information. The consumer credit reporting agency may not charge a fee for this service. Any pertinent information and copies of all documents you have concerning an error should be given to the consumer credit reporting agency.

If reinvestigation does not resolve the dispute to your satisfaction, you may send a brief statement to the consumer credit reporting agency to keep in your file, explaining why you think the record is inaccurate. The consumer credit reporting agency must include your statement about disputed information in any report it issues about you.

You have a right to cancel the contract for any reason within five working days from the date you signed it. If for any reason you do cancel the contract during this time, you do not owe any money You have a right to sue a credit services organization if it misleads you.

**The following disclosure applies to COLORADO residents:**

RIGHTS UNDER COLORADO AND FEDERAL LAW

You have a right to obtain a copy of your credit report from a credit bureau for a small fee. You have a right to dispute

ID: 124263 Signed: 2018-02-26T17:45:24-06:00

inaccurate information by contacting the credit bureau directly. However, you have no right to have accurate information removed from your credit bureau report. Under the federal "Fair Credit Reporting Act", the credit bureau must remove accurate negative information from your report only if it is over 7 years old. Bankruptcy can be reported for 10 years. Even when a debt has been completely repaid, your report can show that it was paid late if that is accurate. You have a right to sue a credit repair company that violates the "Colorado Credit Services Organization Act". This law prohibits deceptive practices by repair companies.

The "Colorado Credit Services Organization Act" also gives you a right to cancel your contract for any reason within 5 working days from the date you sign it.

The Federal Trade Commission enforces the federal "Fair Credit Reporting Act". For more information, call or write the Federal Trade Commission. The administrator of the uniform consumer credit code enforces the "Colorado Credit Services Organization Act". For more information, call or write the Colorado attorney general's office.

**The following disclosure applies to NEW YORK residents:**

## RIGHT TO REVIEW YOUR FILE

The Federal Fair Credit Reporting Act gives you the right to know what your credit file contains, and the consumer reporting agency must provide someone to help you interpret the data. The New York Fair Credit Reporting Act gives you the right to receive an actual copy of your credit report. You will be required to identify yourself to the consumer reporting agency and you may be charged a small fee. There is no fee, however, if you have been turned down for credit, employment, or insurance because of information contained in a report within the preceding thirty days.

## INCORRECT INFORMATION

Consumer reporting agencies are required to follow reasonable procedures to ensure that subscribing creditors report information accurately. However, mistakes may occur.

When you notify the consumer reporting agency in writing that you dispute the accuracy of information, it must reinvestigate and modify or remove inaccurate data. The consumer reporting agency may not charge any fee for this service. Any pertinent data you have concerning an error should be given to the consumer reporting agency.

If reinvestigation does not resolve the dispute to your satisfaction, you may enter a statement of one hundred words or less in your file, explaining why you think the record is inaccurate.

The consumer reporting agency must include your statement about disputed data -- or a coded version of it -- with any reports it issues about you. New York law also provides that, at your request, the consumer reporting agency must notify any person

ID: 124263 Signed: 2018-02-26T17:45:24-06:00

who has received a report in the previous year that an error existed and furnish such person with the corrected information.

## TIME LIMITS ON ADVERSE DATA

Most kinds of information in your file may be reported for a period of seven years. If you have declared personal bankruptcy, however, that fact may be reported for ten years.

After seven years or ten years, the information can't be disclosed by a credit reporting agency unless you are being investigated for a credit application of $50,000 or more, for an application to purchase life insurance of $50,000 or more, or for employment at an annual salary of $25,000 or more.

**The following disclosure applies to OHIO residents:**

### Credit Reporting Practices

### Rights of Consumers Ohio and Federal Law

Under the federal Fair Credit Reporting Act, you have all of the following legal rights:

You have a right to obtain a copy of your credit report from a consumer reporting agency. You may be charged a reasonable fee. However, there is no fee if you have been turned down within the preceding sixty days for credit, employment, insurance, or a rental dwelling because of information in your credit report. The consumer reporting agency must provide someone to help you interpret the information in your credit file.

You have a right to dispute inaccurate information by contacting the consumer reporting agency directly. However, neither you nor any credit services organization has the right to have accurate, current, and verifiable information removed from your consumer reporting agency report. The consumer reporting agency must remove accurate, negative information from your report only if it is more than seven years old. Bankruptcy information can be reported for ten years. Accurate information cannot be permanently removed from the files of a consumer reporting agency. Credit reporting agencies are required to follow reasonable procedures to ensure that creditors report information accurately. However, mistakes may occur.

You may, on your own, notify a consumer reporting agency in writing that you dispute the accuracy of information in your credit file. The consumer reporting agency then must reinvestigate and modify or remove inaccurate information. The consumer reporting agency must not charge any fee for this service. Any pertinent information and copies of all documents you have concerning an error should be given to the consumer reporting agency.

If reinvestigation does not resolve the dispute to your satisfaction, you may send a brief statement to the consumer reporting agency to keep in your file, explaining why you think the record is inaccurate. The consumer reporting agency must include your statement about disputed information in any reports it issues about you.

ID: 124263 Signed: 2018-02-26T17:45:24-06:00

Under Ohio law, you have a right to sue a credit services organization that violates the Ohio Credit Services Organization Act. This law prohibits deceptive practices by credit services organizations and gives you a right to cancel your contract for any reason within three business days from the date you signed it.

I hereby acknowledge that I have received and read the Credit Precision Information Statement and that I have received the Credit Precision Information Statement prior to executing any contract with Credit Precision.

2/26/18

Signature                                                    Date

ID: 124263 Signed: 2018-02-26T17:45:24-06:00

**Credit Repair Services Agreement**

Credit Precision

280 Interstate North Circle SE, Suite 500

Atlanta, Georgia 30339

Phone: ((770)790-6108

Fax: (770) 790-6131

Vickie Phan, ("Client") hereby enters into the following Credit Repair Services Agreement (the "Agreement") with Credit Precision. This Agreement is made and effective on Feb 26, 2018 (date) by and between Credit Precision and Client.

The Client acknowledges that Peak Debt Consumption has contracted with Credit Precision to provide credit repair services for Peak Clients.  Client hereby authorizes Peak to share any and all credit information that Peak has obtained in relation to its relationship with the Client with Credit Precision to be used for credit repair services for the Client.

With respect to the credit repair services that Credit Precision will perform for Client, Credit Precision will be paid from the Client/Peak escrow account. The Client hereby authorizes Credit Precision to receive such payments from the Client/Peak escrow account.

## I. CREDIT PRECISION SERVICES

Credit Precision hereby agrees to perform the following services:

·    Perform initial consultation to evaluate Client's current credit reports as currently maintained by the three national credit reporting agencies; Transunion, Equifax, and Experian, and any other credit reporting agencies identified by Client and to identify inaccurate, erroneous, false, or obsolete information ("Dispute Items") in such credit reports.

·    To advise Client as to the necessary steps to be taken by Client, in conjunction with Credit Precision, to dispute any Dispute Items contained in the Client's credit reports.

·    To prepare all correspondence necessary to legitimately dispute any Dispute Items that may be contained in Client's credit reports.

·    To submit up to 5 rounds of correspondence (electronic or US mail) to the CRAs as necessary for the credit repair process.

·    To contact and notify the CRAs that all enrolled Debt Items settled by Peak are presented accurately on the Client's credit file.

Credit Precision shall perform all services identified above for a maximum term of 180 days.

## II. CLIENT'S OBLIGATIONS

With respect to the credit repair services that Credit Precision will perform for the Client, Credit Precision will be paid from the Client/Peak escrow account. The Client hereby authorize Credit Precision to receive such payments from the Client/Peak escrow account.

In exchange for Credit Precision performing the credit repair services above, the following fees will be deemed earned and payable from the Peak escrow account:

The total amount Peak will disburse on your behalf is $750 - paid from time to time directly from the escrow account as repair services are performed.

The schedule of payments for credit repair services from the escrow account are as follows:

- Initial 20% of the agreed price for credit repair service will be deemed as earned and payable once the initial consultation is performed.
- Additional 30% of the agreed to price for credit repair services will be deemed as earned and payable once all the items to be disputed are indentified, Client letters containing said items are generated and letters are either electronically submitted or mailed via first class U.S. delivery to all CRAs (this is expected to occur within 10-20 days of signup).
- The Balance of 50% is deemed earned and payable after a maximum of (5) rounds of dispute submissions and once the final enrolled debt consumption item is deemed negotiated and a settlement letter is received by Peak.
- You may cancel your service at any time. Upon cancellation, services will be discontinued and you will be responsible for all fees deemed earned and payable from your escrow account with Peak that were incurred prior to cancellation.
- The Client agrees to share all dispute investigation result letters directly received from Experian, Equifax, and/or TransUnion with Credit Precision. The Client also agrees to refrain from contacting the CRAs or creditors without first contacting Credit Precision regarding the concerns.

## III. AUTHORIZATION FOR CREDIT REPAIR SERVICES

1. Client authorizes Credit Precision to make, receive, sign, endorse, execute, acknowledge, deliver, and possess such applications, correspondence, contracts, or agreements, as necessary to correct inaccurate, erroneous, false, or obsolete information contained in Client's credit report. Client grants to Credit Precision the authority to do, take, and perform, all acts

ID: 124263 Signed: 2018-02-26T17:45:24-06:00

and things whatsoever requisite, proper, or necessary to be done, in the exercise of correcting information contained in the credit reports maintained on behalf of Client by the three major credit reporting agencies; Experian, Equifax, TransUnion, and any other reporting agencies or creditors identified specifically by Client.

2. This authorization may be revoked by Client at any time by giving written notice to Credit Precision. All fees deemed earned and payable from your escrow account with Peak. prior to the revocation notice date will be charged by Credit Precision to your Peak escrow account. Any activity conducted prior to any revocation in reliance upon this authorization shall not constitute a breach of any rights of the Client. If not earlier revoked, this authorization will automatically expire six months from the date of this Agreement.

3. Client agrees that he or she shall cooperate with Credit Precision in the performance of the credit repair services and will execute such documents necessary to assist with the credit repair services. Client agrees to submit all correspondence received from credit reporting agencies (CRAs) and/or Creditors directly to Credit Precision. Other such cooperation may also include, but not be limited to, notarizing documents and emailing and mailing executed document to Credit Precision.

4. Client acknowledges that Credit Precision will perform a maximum of (5) round of dispute submissions on Client's behalf in the 180 day term of the contract.

5. Client acknowledges that while Credit Precision will dispute all Dispute Items, Credit Precision cannot guarantee that all Dispute Items will be resolved during the 180 day term. Some may remain due to various circumstances as reported by any of the CRAs and/or Creditor.

## IV. FEDERAL E-SIGN ACT DISCLOSURE AND CONSENT

Electronic Delivery of Disclosures and Notices

 [After reading the e-sign disclosure and consents, the Cient will then be presented a opportunity when they can electronically sign their Client agreement]

 By signing below, I hereby agree to be bound by the terms and conditions of this Agreement. I acknowledge and confirm that I have read the Agreeement and understand its terms and conditions before signing below.

| | | |
|---|---|---|
| _(signature)_ | Vickie Phan | 2/26/18 |
| Signature | (Print Name) | (Date) |

 **\*\*YOU MAY CANCEL THIS CONTRACT, WITHOUT ANY PENALTY OR OBLIGATION AT ANY TIME BEFORE MIDNIGHT OF THE 3rd BUSINESS DAY AFTER THE DATE ON WHICH YOU SIGNED THE CONTRACT. SEE THE ATTACHED NOTICE OF CANCELLATION FORM FOR AN EXPLANATION OF THIS RIGHT.\*\***

ID: 124263 Signed: 2018-02-26T17:45:24-06:00

HIPAA Authorization

I, Vickie Phan, authorize Credit Precision Inc. to use the following protected health information and/or disclose the following protected health information to consumer reporting agencies and creditors of accounts specifically related to the protected health information.

The protected health information includes medical records, treatment records, diagnostic records, and other records related to medical accounts contained on your credit report.

The protected health information may be used and disclosed in connection with credit repair services and correction of medical account trade lines on your credit report.

This authorization expires 180 days from the date you sign below.

You may revoke this authorization at any time by notifying Credit Precision Inc. in writing of your revocation.  Your revocation will not apply to actions taken by Credit Precision Inc. prior to the date of Credit Precision Inc.'s receipt of your revocation.

You may refuse to sign this authorization.  Your refusal to sign will not affect your ability to obtain medical treatment, payment, enrollment, or your eligibility for medical benefits, although it may affect Credit Precision Inc.'s ability to correct any account that includes protected health information.

The information disclosed pursuant to this authorization may be redisclosed by the recipient and no longer protected by federal privacy regulations.

Signed: 2/26/18

Signature:

Print Name:Vickie Phan

--------------Detachable--------------------Detachable---------------------Detachable------------

## Notice of Cancellation

"You may cancel this contract, without any penalty or obligation, at any time before midnight of the 3rd day which begins after the date the contract is signed by you.

To cancel this contract, mail or deliver a signed, dated copy of this cancellation notice, or any other written notice, to Credit Precision at P.O. Box 671688, Marietta, Georgia 30006 before midnight on _____. (Date)

"I hereby cancel this transaction."

_____  _                    _____

(Client's signature)                                      (Date)

ID: 124263 Signed: 2018-02-26T17:45:24-06:00

--------------Detachable--------------------Detachable---------------------Detachable------------

**Notice of Cancellation**

"You may cancel this contract, without any penalty or obligation, at any time before midnight of the 3rd day which begins after the date the contract is signed by you.

To cancel this contract, mail or deliver a signed, dated copy of this cancellation notice, or any other written notice, to Credit Precision at P.O. Box 671688, Marietta, Georgia 30006 before midnight on _____. (Date)

"I hereby cancel this transaction."

_____  _                                              _____

(Client's signature)                                                    (Date)

ID: 124263 Signed: 2018-02-26T17:45:24-06:00



# E-Signature Completion Certificate

| | |
|---|---|
| **Document ID** | 124263 |
| **Document Title** | Credit Repair Contract |
| **Sender IP** | 207.173.53.68 |
| **Number of Signers** | 1 |
| **Signer Email** | vtp009@yahoo.com |
| **Signer IP** | 73.106.20.91 |
| **Timestamp** | 2018-02-26T17:45:24-06:00 |
| **Document Hash** | d41d8cd98f00b204e9800998ecf8427e |

## Document Audit

- Send at 2018-02-26T12:46:42-06:00 from IP 207.173.53.68
- Delivered to vtp009@yahoo.com at 2018-02-26T17:44:21-06:00 from 73.106.20.91
- Adopted Signature at 2018-02-26T17:44:33-06:00 from 73.106.20.91
- Completed Signing at 2018-02-26T17:45:24-06:00 from 73.106.20.91
- PDF Generated at 2018-02-26T17:45:24-06:00

## User Agent

Mozilla/5.0 (iPad; CPU OS 11_2_5 like Mac OS X) AppleWebKit/604.5.6 (KHTML, like Gecko) Version/11.0 Mobile/15D60 Safari/604.1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

| | | |
|---|---|---|
| VICKIE PHAN, and | ) | |
| KAY KALANTARI, | ) | |
| individually and on behalf of all | ) | |
| others similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | CIVIL ACTION NUMBER: |
| v. | ) | 1:19-cv-04613-JPB |
| | ) | |
| PEAK DEBT CONSUMPTION, | ) | |
| LLC | ) | |
| CHRIS MCCORMICK, | ) | |
| FISHER LAW GROUP, PLLC, and | ) | COMPLAINT – CLASS ACTION |
| DAVID FISHER, | ) | |
| | ) | JURY TRIAL DEMANDED |
| Defendants. | ) | |

**EXHIBIT 5 – TETON DEBT SETTLEMENT CONTRACT**



## DEBT CONSUMPTION TERMS AND CLIENT AGREEMENT

This client agreement ("Agreement") is made and entered into on this 16th day of February, 2017, ("Effective Date") by and between Teton Debt Settlement Corporation, a Utah Corporation, with its principal place of business at 5442 S 900 E #260, Salt Lake City, Utah 84117 ("Teton") and Dr. Kay Kalantari, an individual residing at 1938 Bennetts Point Dr, Marietta, GA. 30068-1586 ("Client").

1.    **Purpose**.  Teton is a debt management and debt consumption company; Client desires to engage Teton to perform various debt-related services, including, but not limited to, the attempted negotiation of Client's various debts to obtain more favorable terms, the facilitation of payments to creditors under the new terms, and transfer of debt reporting by creditors to credit bureaus from Client to Teton, credit repair, credit building, and related services (collectively "Services").

2.    **Term**.  The term of this agreement shall begin on the Effective Date and shall continue perpetually until Teton has completed its Services or until terminated by either party pursuant to this Agreement.

3.    **Accounts**.  Teton will attempt to negotiate and obtain more favorable terms on the following accounts and for the following fees:

| Name | Account # | Amount | % | Paid from Client |
|---|---|---|---|---|
| Processing Fee | | | | $3,000.00 |
| Bank Of America Practice Solution Loan | | 258,727.50 | 35% | $90,554.63 |
| Line of Credit | | 70,000.00 | 35% | $24,500.00 |
| Citi Business | | | 35% | |
| Citi Diamond Pr | | | 35% | |
| Capital One | | | 35% | |
| Bank Of America | | | 35% | |
| Wells Fargo | | | 35% | |
| AMEX Business | | | 35% | |
| Suntrust | | | 35% | |
| Regions | | | 35% | |
| **Total Amount to be Placed in Escrow/Trust by Client: $** | | | | |

4.    **Payment Terms**. Teton does not require any up-front fees for its Services.  Rather, Teton places Client funds in an escrow/trust account at an independent, insured financial institution until the funds can be earned and disbursed.  Client shall remain the owner of Client's funds held in escrow/trust and Client may demand a return of the same at any time, **if not already disbursed to Teton, Client's creditors, and/or other third parties whom Teton deems should receive funds.**



Teton's fees shall be earned on a per account basis, whenever Teton successfully obtains a **new written payment plan or settlement from a creditor**, and Teton makes at least **one payment under such new plan**, in compliance with the Telemarketing Sales Rule 16 CFR Part 310.  Client is responsible for depositing thirty-five percent (35%) of Client's total liability, processing fees, and rapid re-score fees into the escrow account. Such amount is listed above and can be deposited into the escrow account either in a single lump sum or multiple payments.  Teton will retain any difference between the amount Client deposited into escrow and the amount that Teton is able to settle with Client's creditors for.  Client acknowledges that Teton has the authority, in its sole discretion, to direct any trust/escrow officer to prepare for and make disbursements to Teton, Client's various creditors, and/or other third parties whom Teton deems should receive funds.  All fees are exclusive of federal, state, municipal, or other government, excise tax, use, or like taxes on Services sold herein.  See Exhibit A for additional credit cards, if applicable.

5.      **Merchant Services**.  Client acknowledges that Client shall be immediately responsible for the merchant processing fees associates with all transfers of Client's funds, which fees are approximately 3.99% or more and are subject to change.  Charges may appear on Client's bank statements as being from "Teton Debt Settlement Corporation," "Escrow Specialists," or any other merchant processor that Teton chooses to use.  Client acknowledges that in the event that Client files a chargeback with Teton or its affiliates, including the escrow agent, Client shall be responsible for any processing fees incurred and under no circumstances shall Client be entitled to any amount more than what was charged.

6.      **Cancellation**.  **Client, in addition to any right to otherwise revoke an offer, may cancel the sale and receive a full refund up to midnight of the third business day after the receipt of the merchandise or premium, whichever is later.  Because Teton will begin providing the Services immediately upon this engagement, the 3-business day rescission period starts now.**  After that time, processing fees are non-refundable except in the discretion of Teton, or as may be required in order to comply with the law.  In addition, all Client funds placed in escrow/trust by Teton shall remain Client's property until such time as disbursed to Teton for Teton's fee, or dispersed to creditors pursuant to this Agreement.

7.      **Breach of Contract**.  **If Client at any time makes direct contact with Client's creditors or engages in any type of negotiation with Client's creditors it will breach the "Limited Power of Attorney" between Teton and Client and this contract will be immediately voided.**  If this contract is breached and voided, Teton will immediately disburse to Teton any remaining processing fees and its normal profits from clients' fees held in escrow/trust.  This amount is 40% of remaining funds.  Client also agrees to sign and return the "Teton Debt Settlement and Release Agreement" prior to release and return of Clients remaining funds to Client.

8.      **Performance.**  Client understands that Teton will perform to the best of its abilities, but there can be unforeseen circumstances which can delay the consumption, settlement, and completion of Clients accounts. Teton will comply with the "90 Day Guarantee" if Client signs, delivers, and complies with the terms of the "90 Day Guarantee".



*Teton Debt Settlement*

9. **No Legal, Financial or Tax Advice Provided**.  No financial, legal, or tax advice or counsel is given, or shall be deemed to have been given by Teton, its affiliates, contractors, or by the Services.

10. **Indemnification**.  Client shall assume, pay, indemnify, hold harmless and reimburse Teton and its owners, employees, agents, affiliates, contractors, successors and assigns for any and all liabilities, damages, claims, suits, settlements, judgments, investigations, costs, and expenses (including reasonable attorney's fees and court costs) directly or indirectly incurred by Teton to the extent the same are related in any way to this Agreement or to Client's use of the Services. Upon receipt of any demand or claim by Teton related to Client, Teton may elect to turn the defense and resolution of such claim over to Client who shall bear all costs and expenses and shall promptly investigate and settle or otherwise resolve any such claim to Teton's full satisfaction. Alternatively, Teton may elect to defend any such claim on its own and then to obtain reimbursement from Client.  In either case, Teton and Client shall cooperate and share necessary information in any such defense.  Client realizes that Teton may be required by law to provide certain information about Client if Teton receives a subpoena from a court or regulator with competent jurisdiction.

11. **Limitation of Liability**.  Neither party shall be liable for any consequential, incidental, special or indirect damages (including, but not limited to, loss of profits, goodwill, use, data, or other intangible items) even if the other party has been advised of the possibility of such damages or losses.  Teton is not responsible for any failure of a third-party DNC or wireless list provider to deliver its data accurately, completely or in a timely way, Teton is not responsible for damages resulting from improper or incomplete use by Client of Teton's Services.  With respect to any other damages, Teton's liability hereunder shall in no event exceed an amount equal to the amount actually paid by Client to Teton in the month prior to a claim being made, regardless of the basis for the claim.  Client understands that this is a significant limitation on Client right to collect from Teton and Client should not proceed if Client does not agree.  Teton shall not be bound by any typographical or other error or misprint in its marketing materials or online purchase websites.

12. **Warranties**.  Except as otherwise provided herein, THE SERVICES ARE PROVIDED "AS IS" WITHOUT ANY EXPRESS OR IMPLIED WARRANTY OF ANY KIND INCLUDING WARRANTIES OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE. IN NO EVENT, SHALL TETON OR ITS AFFILIATES BE LIABLE FOR ANY DAMAGES WHATSOEVER (INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOSS OF PROFITS, DAMAGED CREDIT, LOSS OF INFORMATION) ARISING OUT OF THE USE OF OR INABILITY TO USE THE SERVICES, EVEN IF TETON HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

13. **Legal Relationship**.  By forming this Agreement, no agency, employment, ownership, partnership, or joint venture relationship is created beyond that of independent contractors.

14. **Choice of Law & Venue**.  This Agreement shall be governed by and construed according to the laws of the State of Utah, without giving effect to normal choice-of-law and conflict-of-law principles.  The parties agree that the state courts in Salt Lake County, State of Utah, shall have exclusive jurisdiction and venue over any legal dispute between the parties.  The parties consent



*Teton Debt Settlement*

to such jurisdiction at this time.  The prevailing party in any legal dispute between the parties shall be entitled to their reasonable attorney's fees and court costs.

15.     **Notices**.  All notices which may or shall be given under this Agreement shall be made by certified mail to the address mentioned above or to such addresses as are otherwise designated in writing by the parties hereto.  If either party has changes its address, a written notice thereof shall be given to the other party.

16.     **Modification of Agreement**.  The Parties agree that this Agreement may only be modified with the written consent of all Parties.

17.     **Entire Agreement**.  This Agreement, along with any addendum, schedule or exhibit incorporated by reference, constitutes the entire understanding and agreement of the parties with regard to the subject matter hereof and supersedes all prior and contemporaneous communications, understandings and agreements, either written or oral.

18.     **Force Majeure**.  Neither Party shall be liable for failure or delay in performing its obligations under this Agreement if such failure or delay is due to circumstances beyond its reliable control, including without limitation fire, flood, windstorm, terrorist action, strike or other labor disturbance, unavailability of telecommunications or other third party services, connectivity failures, or failures of third-party hardware or software.

19.     Prior to arbitrating any dispute, you must first contact us in writing at customerservice@tetondebt.com, so that we can work to resolve the dispute.  In the event that we cannot resolve a dispute within sixty (60) days of notification, you do not respond to our efforts to contact you, or you fail to engage in good-faith settlement discussions with us, then the following procedures shall apply.  All disputes arising out of or relating to this Agreement (including its formation, performance or alleged breach), your use of the Services and/or any purchases you make from us will be exclusively resolved under confidential binding arbitration held in accordance with the Rules of the American Arbitration Association under its Commercial Arbitration Rules and Supplementary Procedures for Consumer-Related Disputes.  The arbitrator's award will be binding and may be entered as a judgment in any court of competent jurisdiction.  To the fullest extent permitted by applicable law, no arbitration under this Agreement will be joined to an arbitration involving any other party subject to this Agreement, whether through class arbitration proceedings or otherwise.  Notwithstanding the foregoing, Teton will have the right to seek injunctive or other equitable relief in state or federal court to enforce this Agreement or prevent an infringement of a third party's rights.  In the event equitable relief is sought, each party hereby irrevocably submits to the personal jurisdiction of such court.  Any in-person appearances requested shall be held in Salt Lake County, Utah.  The arbitrator's decision shall be based upon the substantive laws of the State of Utah without regard to its principles of conflicts of law.  Arbitration proceedings shall be conducted in English and shall be conducted in a manner that preserves confidentiality.

20.     **Survival**.  Any provision of this Agreement, which by its nature, would naturally survive the termination of this Agreement, shall expressly survive any termination, including without



limitation, those provisions related to indemnity, compliance with law, intellectual property, non-circumvention and notices.


AUTHORIZED SIGNATURES ON THE FOLLOWING PAGE


Accepted and agreed to by:

**Client:**

Signature: _____

Print Name: _____

Date: _____


**Teton Debt Settlement Corporation**

Signature: _____

Title: _____

Date: _____

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

VICKIE PHAN, and            )
 KAY KALANTARI,             )
individually and on behalf of all   )
others similarly situated,   )
                            )
        Plaintiffs,         )
                            )        CIVIL ACTION NUMBER:
v.                          )        1:19-cv-04613-JPB
                            )
PEAK DEBT CONSUMPTION,      )
LLC                         )
CHRIS MCCORMICK,            )
FISHER LAW GROUP, PLLC, and )        COMPLAINT – CLASS ACTION
DAVID FISHER,               )
                            )        JURY TRIAL DEMANDED
        Defendants.         )
_____ )

**EXHIBIT 6 – TETON DEBT SETTLEMENT POWER OF ATTORNEY**



# Power of Attorney &
# Authorization for Release of Records

I, Dr. Kay Kalantari, hereby appoint Teton Debt Settlement Corporation, located at 5442 S 900 E, #260, Salt Lake City, Utah 84117, and/or assigns, as my attorney, in fact ("Agent") for me and in my name, and for my use and benefit for a period of thirty-six months from the date this document was signed. My Agent shall have full power and authority to act on my behalf for all of the following:

1.To demand, sue for, recover, collect, and receive any and all money, debts, accounts, legacies, bequests, interests, dividends, annuities, and demands whatsoever as are now or shall hereafter become due, owing, payable, or belonging to or claimed by me.

2. To use all lawful means necessary for the recovery thereof, by legal process or otherwise.

3. To compromise, release, subordinate, satisfy and discharge the same.

4. To consume and/or settle all debts, accounts, and funds as listed in this document.

5. To receive all my rights to have these accounts benefit or be detrimental to my credit accounts.

6. To receive, pull, request, and gather information from my credit report, and to any or all open or closing of these listed accounts.

Consumption or transfer of my rights to all lawsuits, or any other needed action, will be performed by, and the responsibility of, the power of my Agent.

This document has a single addendum with the power of attorney for service rendered (see contractual and agreements). To execute, join in the execution or receive, and deliver such documents of whatever kind or nature as may be advisable in the premises, regarding:

| | CREDITOR | ACCOUNT # | $ AMOUNT | PHONE # |
|---|---|---|---|---|
| 1. | Regions | ██████████ | | |
| 2. | Bank of America practice solution loan | | 258,727.50 | |
| 3. | Line of Credit | | 70,000 | |
| 4. | Citi Business | ██████████ | | |

Initials: _____                    1



5.  Citi Diamond Preferred  ▮▮▮▮▮▮▮▮
_____

6.  Capital One  ▮▮▮▮▮▮▮▮
_____

7.  Bank Of America  ▮▮▮▮▮▮▮▮
_____

8.  Wells Fargo  ▮▮▮▮▮▮▮▮
_____

9.  American Express Business  ▮▮▮▮▮▮▮▮
_____

10. Bank Of America  ▮▮▮▮▮▮▮▮
_____

11. Suntrust  ▮▮▮▮▮▮▮▮
_____

I grant Agent full power and authority to do everything Agent deems advisable regarding these matters as I might do if I were personally present including: the right to determine whether any transaction shall be for cash, credit, exchange or otherwise, with or without warranty, and to fix or agree to all terms and conditions of every transaction, whether involving separate or community property.

Upon settlement on any related debt, I grant Agent all "right, title and credit" to such debt, including the right to take such debt as Agents and have creditors and credit bureaus report such debt in the name of Agent, rather than me, in accordance with these terms. The implication is that upon settlement, such debts, at Agent's discretion, shall become the debts of Agent, rather than myself.

I have read and understand my rights as provided in Section 3410 of the RFPA and hereby authorize the Teton Debt Settlement Corporation to disclose the following financial records or information to my above-listed creditors for the purposes of debt verification and/or debt settlement:

DOB ▮▮▮ 1973_____        S.S.N.#_____

Driver's License # ▮▮▮▮▮_____ State Georgia_____ EXP 12/10/2018

I understand that this authorization may be revoked by me in writing at any time before my records or information described above are disclosed, and that this authorization is valid for no more than thirty-six months from the date of my signature.

_____        _____



Printed Name                                    Signature of Principal

_____
Date

_____
Address

_____   _____   _____
City                                    State                    Zip

STATE OF _____)
                         : ss
County of  _____)




On this _____ day of _____, 20____, before me, _____,
a notary public, personally appeared _____, who is personally known
to me or proved to me on the basis of satisfactory evidence to be the person whose name is
signed above.


                        _____
                        NOTARY PUBLIC

My Commission Expires: